UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

CLEAR CHANNEL OUTDOOR, INC.,

                Plaintiff,

      - against -

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City Department
of Buildings,

             Defendants.

---------------------------------------------------------------- x

Civil Action No.

06 Civ.8193(PAC)

**COMPLAINT**

Plaintiff CLEAR CHANNEL OUTDOOR, INC. ("Clear Channel") by its undersigned

attorneys, Davis Wright Tremaine LLP, as and for its complaint against defendants THE CITY

OF NEW YORK and PATRICIA J. LANCASTER, in her official capacity as Commissioner of

the New York City Department of Buildings ("DOB") (collectively, the "City" or "Defendants"),

alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to preliminarily and permanently enjoin various unconstitutional

New York City regulations governing signs along arterial highways[1] on the ground that they

violate the First Amendment.  Clear Channel owns and operates outdoor signs throughout New

York City and other markets.  It challenges, on their face and as applied to its signs, the

following provisions of the City's regulatory regime:  (i) the ban on advertising signs within 200

feet of, and within view of, an arterial highway set forth in New York City Zoning Resolution

§§ 42-55 and 32-662; (ii) the provisions of New York City Local Law 14 of 2001 and Local

---

[1] The designated "arterial" highways are defined in Appendix C to the Zoning Resolution and include
more than 70 highways, parkways and toll crossings in the five boroughs.

Law 31 of 2005; and (iii) the recently issued Department of Buildings ("DOB") Rule 49 in its

entirety. (The challenged provisions are referred to collectively herein as the "Regulations.")

This is an action for declaratory, injunctive and other relief arising out of the First and

Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.       Although the City has prohibited signs advertising off-premises goods or services

near arterial highways in commercial and manufacturing districts since 1940, the City has

enforced this ban only sporadically.  Over the years, the City has issued hundreds of permits for

large on-site signs on arterial highways and largely turned a blind eye as these signs were

converted to off-site advertising purposes.  However, under a new DOB Rule, which belatedly

puts into effect the provisions of Local Law 14 of 2001 and Local Law 31 of 2005, the City has

decided to enforce the Zoning Resolution's ban on arterial advertising signs by requiring all

outdoor advertising companies to register their full inventories of arterial signs.  The Regulations

also impose severe civil and criminal penalties, including prohibition of offending outdoor

advertising companies from doing business in the City.  This new regime will – barring judicial

intervention – mandate the removal of scores of advertisements on arterial sign structures around

the City.

3.       The City's purported justification for the Regulations is a desire to promote traffic

safety and aesthetics.  However, there is no credible evidence that these signs, which have stood

for years and often decades, have created any traffic safety problems.  Moreover, at the same

time that the City seeks to vigorously impose its ban on post-1979 advertising signs on private

property, the City and various other instrumentalities of New York State, such as the MTA,  and

the Port Authority of New York and New Jersey (a bi-state agency), have themselves covered the

City with advertising signs on virtually every form of government property – including on

billboards, bus shelters, subway entrances, and phone kiosks along the arterial highways.  In an effort to bring in substantial revenues, they have covered the arterial highways with more than 80 billboards, more than 190 advertisements on subway panels, and at least 75 bus shelters featuring advertisements – with more to come.  Critically, the City is currently seeking to enter into a blockbuster 20-year street furniture franchise agreement with Cemusa, Inc. for estimated revenues of more than one billion dollars from advertising sources, under which Cemusa will saturate the City with ads on thousands of new bus shelters, newsstands and other street furniture, including in residential districts, and many along the arterial highways.

4.      The government may not constitutionally restrict advertising on private property while creating exception upon exception principally for its own benefit.  Such inconsistencies totally undermine its purported interests.  Due to the many loopholes and inconsistencies in the government's regulatory regime, the Regulations utterly fail to directly and materially advance a substantial government interest, and burden more speech than is necessary to achieve their purported goal.  Thus, the Regulations are unconstitutional restrictions of commercial speech under the standards enunciated in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New* York, 447 U.S. 557 (1980), and its progeny, including *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), and *Greater New Orleans v. U.S.*, 527 U.S. 173 (1999), and infringe the rights of both Clear Channel and the viewing public.

5.      Local Laws 14 and 31 and Rule 49 also institute onerous certification and documentary requirements necessary to prove the "non-conforming" status of certain signs. Signs that have existed along the arterial highways as advertising signs since November 1, 1979 were "grandfathered" into compliance as of that date.  For over 26 years, these non-conforming signs have been permitted to remain standing without needing to meet any certification or

documentary requirements.  Now, after the vast majority of these signs have changed ownership, often multiple times, and many of the relevant documents have been lost or mislaid, the City has suddenly decided to require companies to provide specific documents dating back at least 26 years – and perhaps as many as 50 years or longer – establishing that each non-conforming sign existed, and contained advertising copy, prior to November 1, 1979.  The City has even deemed insufficient the very documents issued by the DOB in 1979 when many individual non-conforming signs were legalized.

6.      Thus, standing alone, the certification, documentary and posting requirements of DOB Rule 49 are also unconstitutional.  They do not directly and materially advance a substantial government interest and additionally are far more restrictive than is necessary to advance these interests.

7.      In sum, Clear Channel seeks a judgment and order from this Court declaring and decreeing the Regulations unconstitutional on their face and as applied to Plaintiff, and preliminarily and permanently enjoining the City and the DOB from enforcing the Regulations.

**JURISDICTION AND VENUE**

8.      This action arises under and pursuant to the First and Fourteenth Amendments to the United States Constitution, 28 U.S.C. §§ 2201(a) and 2202, and 42 U.S.C. § 1983.  The Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(a)(3).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) in that the claims asserted in this Complaint arose in the Southern District of New York.

**THE PARTIES**

10.     Plaintiff Clear Channel Outdoor, Inc. is a Delaware corporation whose principal place of business is Phoenix, Arizona.  Clear Channel is authorized to do and is doing business in the State of New York.  Clear Channel owns and/or operates approximately 236 sign faces in

New York City throughout commercial and manufacturing districts and, through its division Clear Channel Spectacolor, owns approximately 80 signs in the Times Square area. Clear Channel's signs display both commercial advertising copy and non-commercial copy. It owns and/or operates approximately 95 sign faces constructed both before and after November 1, 1979 that are located within 200 feet of a New York City arterial highway and visible from such highway.

11.     Defendant City of New York is a political subdivision of the State of New York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment and enforcement of outdoor advertising regulations within New York City.

12.     Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

13.     The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL BACKGROUND

### The History of Arterial Advertising Signs in New York City

14.     Since 1940, the City has prohibited "advertising signs" within 200 feet of an arterial highway and within view of such highway. An advertising sign (also called an "off-site" sign), is defined as a sign that "directs attention to a business, profession, commodity, service or entertainment conducted, sold, or offered elsewhere than upon the same zoning lot and is not

accessory to a use located on the zoning lot." ZR § 12-10.  The Zoning Resolution permits

"accessory signs" (also called "on-site" signs) along the arterial highways.  Such a sign is

defined as a sign that advertises (a) a use "conducted on the same zoning lot as the principal use

to which it is related" ... (b) "a use which is clearly incidental to, and customarily found in

connection with, such principal uses"; and (c) a sign which "is either in the same ownership as

such principal use, or is operated and maintained on the same zoning lot substantially for the

benefit or convenience of the owners, occupants, employees, customers, or visitors of the

principal use." *Id.*

15.     Since 1965, New York City has been certified by New York State to act in its

place in regulating signs within City boundaries on the "primary highway system," as defined in

the Highway Beautification Act, 23 U.S.C.A. 131.

16.     Despite the prohibition on advertising signs near arterial highways, a great

number of such signs were built abutting the arterial highways from 1940 through 2001.  In

general, the City issued permits for large accessory signs along the arterial highways, and,

without permission, the sign owners converted the signs to advertising signs.  Over the last 66

years, the City has only intermittently taken steps to enforce this prohibition or otherwise

sanction the signs' owners.  Mostly, the City has looked the other way.  It may well have done so

because both off-site and on-site advertising became increasingly prevalent throughout

commercial and manufacturing districts, and thus the signage along the arterials was merely in

keeping with the overall appearance of the district.

17.     In 1979, rather than pass a new, forward-looking, comprehensive master plan

taking into account the growing presence of off-site advertising throughout commercial and

manufacturing districts, the City of New York merely amended the Zoning Resolution to grant

"non-conforming status" to all arterial advertising signs that had existed before November 1, 1979. Such signs are exempted from the ban on arterial signs erected after that date, and therefore can continue to display off-site commercial advertisements. New York Zoning Resolution ("ZR") §§ 42-55, and 32-662.

18.     For many years after 1979, despite the prohibition on the building of new advertising signs, the City continued to issue permits for large accessory signs which were thereafter, without authority, converted to advertising signs. Indeed, between 1979 and 2000, the City issued over 300 permits for the erection of large accessory signs along arterial highways, with few, if any, efforts to limit those signs to accessory or non-commercial use. Despite the fact that the signs were clearly visible to any passerby, during this 20-year period the City issued only very few, scattered violations to the sign-owners, with one brief spike in enforcement activity in 1999.

**Local Law 14, Local Law 31 and DOB Rule 49**

19.     Despite the City's lax enforcement of these long-existing regulations, over the last five years (2001-2006), the City has developed a new regulatory regime, which did not go into effect until August 2006. As described below, the Regulations prohibit outdoor advertising companies from displaying advertising signs within 200 feet and within view of an arterial highway unless the companies can prove that the signs are either accessory signs or "non-conforming" signs which were used as advertising signs before November 1, 1979. Local Laws 14 and 31 and DOB Rule 49 impose permit regulations and requirements on outdoor advertising companies to register their inventory of arterial signs.

20.     Further, these regulations also impose draconian certification and documentary requirements which make it nearly impossible in most cases of pre-November 1, 1979 signs to prove their non-conforming status.

21.     More specifically, in February 2001, the City Council of the City of New York ("City Council") amended the Zoning Resolution to limit the size of all signs near arterial highways. ZR §§ 32-661, 42-55 (2001). (This action does not challenge these size restrictions.)

22.     At the same time, the City Council also amended the New York City Administrative Code ("Admin. Code") by adopting Intro. 809/Local Law 14 ("Local Law 14").

23.     Local Law 14 provided for a registration scheme whereby all outdoor advertising companies would be required to register their arterial signs with the DOB in order to do business. Admin. Code §§ 26-253 to 255, 26-260. As part of the registration process, outdoor advertising companies would be required to include a certification from a registered architect or engineer and a responsible officer that all arterial signs under the control of the outdoor advertising company are in compliance with the Zoning Resolution. Admin. Code § 26-260 to 261.

24.     Local Law 14 also provided significant civil and criminal penalties against outdoor advertising companies. For example, it allowed the DOB to revoke, suspend or refuse to renew the registration of an outdoor advertising company or impose fines or other penalties if (i) such company made statements that it knew or should have known were false in any application for registration; (ii) such company failed to file a listing of all signs and sign locations under its control; or (iii) such company violated the DOB's rules pertaining to outdoor advertising. Admin. Code § 26-260(d).

25.     In April 2005, the City Council adopted Local Law 31, which made relatively minor revisions to the permit and registration requirements of Local Law 14, but clarified that outdoor advertising companies were required to provide the DOB with an inventory of all signs and sign structures under their control located (i) within a distance of 900 feet from and within view of an arterial highway; or (ii) within a distance of 200 feet from and within view of a public

park with an area of one half acre or more. Admin. Code § 26-261.

26.    By their terms, the registration requirements of Local Laws 14 and 31 did not take

effect until the promulgation of a Rule by the DOB. For more than five years after the passage

of Local Law 14, the DOB did not promulgate a rule.

27.    Rule 49 was eventually promulgated on July 26, 2006 and went into effect on

August 25, 2006. It provides outdoor advertising companies 60 days to submit their registration

materials to the DOB. Rule 49 § 49-11. Thus, by October 24, 2006, all outdoor advertising

companies must register all of their signs within 900 feet of an arterial highway, with all of the

documentation required by Rule 49.

28.    Critically, under Rule 49, the Zoning Resolution and the Administrative Code,

outdoor advertising companies must certify that their arterial signs are in compliance with

Zoning Regulations; thus, with respect to signs within 200 feet of an arterial highway, they may

only register (i) non-conforming signs built before November 1, 1979, (ii) accessory signs, or

(iii) advertising signs containing non-commercial copy. Accordingly, by October 24, 2006,

outdoor advertising companies must take down all off-site advertising copy on any post-1979

sign structures within 200 feet of the City's arterial highways.

29.    Rule 49 also effectuates the certification and documentary requirements of Local

Laws 14 and 31, requiring outdoor advertising companies to prove that pre-November 1, 1979

signs were actually built before that date and in use as advertising signs before that date. It lists

certain types of documents that may be used to establish the lawful status of these signs:

"Acceptable evidence may include permits, sign-offs of applications after completion,

photographs and leases demonstrating that the non-conforming use existed prior to the relevant

date." Rule 49 § 49-15(c)(4)(b). However, "affidavits, Department cashier's receipts and permit

applications, without other supporting documentation, are not sufficient to establish the non-conforming status of a sign." Rule 49 § 49-15(c)(4)(b). The new Rule further requires the submission of additional information for illuminated signs. Rule 49 § 49-15(d)(13).

**Impact of the Regulations on Clear Channel**

30.    All of Clear Channel's 95 arterial sign faces on private property, except one structure, were built prior to the passage of the 2001 Amendments to the Zoning Resolution and Local Law 14.

31.    While some of Clear Channel's arterial signs qualify as non-conforming signs built prior to November 1, 1979, many of Clear Channel's arterial signs that it acquired from predecessor companies do not. Under Rule 49, Clear Channel would be required to remove the commercial signage on these billboards and replace it with non-commercial signage in order to register as an outdoor advertising company.

32.    Even as to the older, non-conforming signs owned by Clear Channel, it may be difficult or impossible to establish this status (and such signs would thereby remain ineligible to display commercial advertisements). In 1998, Clear Channel (then operating under the name Eller Media Company) entered the New York market by purchasing Universal Outdoor Holdings, Inc. ("Universal"), a public company with outdoor signs in more than 30 metropolitan markets and over 100 separate townships and municipalities. Universal had, in turn, acquired its outdoor advertising assets in New York City from multiple smaller advertising companies. The signs acquired from Universal currently represent the vast majority of Clear Channel's arterial signs in New York City.

33.    It is anticipated that the forced removal of commercial copy from signs which are not permitted under the new regulatory regime, or those for which Clear Channel is not sufficiently able to document their non-conforming status, will cause an annual loss in excess of

$6 million in revenue to Clear Channel.

**Inconsistencies in the Regulatory Scheme**

34.     At the same time that the City now – after many years of lax enforcement – seeks to impose stringent regulations on arterial signs, the City and other governmental entities are actively seeking novel means of raising revenues from advertisements on government property, including arterial highways.  They have been able to accomplish this by taking advantage of striking inconsistencies and loopholes in the City's regulatory regime.  While it is entirely appropriate for the government to raise revenues through advertising, it may not blanket the City with advertisements on its own property while banning outdoor advertisers from doing the same.  The glaring inconsistencies include the following, among other examples:

*i.     MTA, Port Authority, and Amtrak Exemptions*

35.     There are currently more than 80 billboards on MTA, Port Authority, and Amtrak property within 200 feet of an arterial highway in New York City.  These billboards earn substantial revenues for their government lessors.

36.     Upon information and belief, many of these billboards were erected after November 1, 1979 and would not qualify as grandfathered "non-conforming" signs if owned by private companies.  However, these billboards on government property carry the same type of commercial advertising copy as the advertising signs on private property which will be banned under the Regulations.  (Indeed, the signs are often managed for the MTA, Port Authority, and Amtrak by outdoor advertising companies.)

37.     The MTA actively competes in the signage market.  Its website, at www.mta.nyc.us/mta/realestate/ad_tele.html, states: "Direct your message to the millions of people each day who use the MTA system .... Display your advertising on billboards attached to elevated structures along the subway rights of way in Manhattan, the Bronx, Queens, Brooklyn,

[and] Staten Island."

38.     The MTA is on the verge of massively increasing its licensing activities in the signage market. In September 2006, it issued a Request for Proposals ("RFP") to install, display and maintain advertising at a wide range of properties owned and operated by the MTA and its affiliated operating agencies (such as the Long Island Rail Road ("LIRR"), Metro-North Rail Road ("Metro-North") and New York City Transit). The RFP encompasses advertising on hundreds of billboards on these properties, in addition to covering the interior and exterior of these facilities and the buses and trains themselves with tens of thousands of posters, illuminated sign faces and diverse other types of advertisements. It also touts the "potential which can be realized through a continued expansion" of MTA licensing activity, stating that the MTA affiliates have identified many areas for "new and expanded advertising programs." Although the proposal process has just begun, it appears that at least 16 of the proposed billboard locations and many of the other new advertisements would abut the City's arterial highways.

39.     The Port Authority, which operates, among other properties, the Holland and Lincoln tunnels and LaGuardia and Kennedy Airports, likewise earns substantial revenue from numerous billboards on these properties, some of which abut arterial highways. According to the Port Authority, in 2004 it earned $7 million in advertising sales at LaGuardia Airport from assorted advertising venues, including 19 billboards and 250 jet bridges.

40.     In 2005, the Port Authority issued an RFP for the development of new and existing advertising at its facilities and on its properties. The RFP stated, "The Port Authority is soliciting under this proposal the widest possible range of companies to propose a total solution or segmented solutions to maximize revenue to the Authority." JC Decaux, the company that won the bid, has already posted advertising signs on LaGuardia Airport property along the Grand

Central Parkway, and erected a massive 6,000 square foot advertising sign on the approach to the Lincoln Tunnel.

41.    *None* of these signs on government property will be impacted by DOB Rule 49. Rule 49 specifically exempts all signs "erected upon property not subject to Department jurisdiction." § 49-01. The DOB has long taken the position that this includes signs on MTA, Port Authority, and Amtrak property.

42.    Such a hands-off approach toward arterial signs on government property appears to derive from the City's desires, not legal necessity. None other than an "Informal Opinion" of the New York State Attorney General dated December 28, 1982 concluded that, "The City of New York may remove commercial billboards erected in violation of the zoning laws on property owned by the Metropolitan Transit Authority and the Consolidated Rail Corporation....[T]he construction and maintenance of commercial billboards on MTA property must be in compliance with the City's zoning ordinance." 1982 WL 178319 at 1-2 (N.Y. A.G. Op. 82-20) (emphasis added). Despite this ruling and a 1984 case holding that the DOB had jurisdiction over a billboard erected on Conrail property, the City has rarely enforced its regulations as to advertising signs on MTA or railroad property, and has permitted these signs to proliferate.

### ii.    *City Property – The Highline and Belt Parkway*

43.    The City also ignores its alleged interests in traffic safety and aesthetics by entering into leases for billboards on its *own* property within 200 feet of an arterial highway.

44.    Since 1980, Clear Channel has leased the right to maintain a billboard on the High Line, the inactive elevated rail structure on the west side of Manhattan running between 34th Street and Gansevoort Streets, near 11th Avenue. This billboard is within 200 feet of, and visible from, the West Side Highway.

45.     In November 2005, the City acquired the High Line.  Since the City has acquired the High Line, it has continued to lease the billboard space to Clear Channel.

46.     As recently as February 27, 2006, the City met with CBS Outdoor, Vista Media and Clear Channel to discuss future leases on High Line signs.

47.     On May 10, 2006, the City agreed to a new lease agreement with Clear Channel, whereby Clear Channel would pay $85,000 a year to the City to lease the billboard.  The negotiation of the new High Line lease to Clear Channel was conducted by the City with the full knowledge of the Deputy Mayor's Office and the Law Department.

48.     The City also leases to another outdoor advertising company another sign on the High Line within 200 feet of the West Side Highway.

49.     Likewise, the City has licensed Clear Channel to maintain two advertising sign faces within 200 feet of the Belt Parkway in Brooklyn, near Stilwell Avenue.  This license has been repeatedly extended since January 1998.

50.     Upon information and belief, there are other billboards within 200 feet of the arterial highways on City property.

iii.    *City Contracts for Advertising on Bus Shelters, Newsstands, Phone Kiosks and Toilets – Cemusa*

51.     The City is also seeking to enter into a twenty-year deal with Cemusa, Inc. (the "Cemusa Agreement"), under which Cemusa will install and maintain at least 3,300 new bus stop shelters, 330 newsstands, up to 20 public toilets and an unspecified number of "public service structures" (such as trash receptacles, newsracks and information kiosks) – and will display expanded advertising on this "street furniture" throughout New York City, including on many structures adjacent to arterial highways and in residential districts.

52.     The Cemusa Agreement provides for advertising on 55 square feet of each bus

stop shelter and 82.5 square feet of each newsstand or toilet, significantly expanding the existing advertising space on street furniture. Moreover, many of these structures will be particularly attention-getting, as the Cemusa Agreement contemplates both electronic media and 250 "Scrollers," which are signs that rotate through different advertisements.

53.     In exchange, Cemusa will pay the City approximately $1.3 billion in revenue and in-kind consideration to the City over a twenty-year period. The City has trumpeted this financial benefit without apparent concern for any adverse effect on traffic safety or aesthetics. For example, Mayor Michael Bloomberg has said that the agreement "is a shining example of the benefits of public-private partnerships" and boasted of the billion-plus dollars in revenues it would bring to the City.

54.     The City's simultaneous tightening of the Regulations at issue in this litigation will no doubt place a premium on this new advertising space and – because the City is entitled to 50% of the revenue from these advertisements – it stands to benefit from effectively shrinking the market.

55.     The proposed deal will also allow the City to use much of the new advertising space to advance its own financial and political ends. As required in the City's RFP, the proposed franchise agreement between the City and Cemusa reserves 20% of Cemusa's advertising space for the City to display advertisements pursuant to its obligations to third parties under "Marketing Partnership" agreements, and another 2.5% of all advertising for "Public Service Advertising" chosen by the City. The Cemusa Agreement also provides that if New York City were awarded the 2012 or any subsequent Olympics, the City could require Cemusa to cease selling and placing advertising on any or all of these structures, restrict the advertiser or the nature of the advertisement on the structures, and assume control of advertising before, during

and after the Olympics.

56.     The City has heralded not just the financial benefits of the Cemusa deal, but the aesthetic benefits, casting doubt on its aesthetic rationale for restricting signs along arterial highways. Despite the prominent nature of the enlarged eye-catching advertisements in the Cemusa prototypes, the Mayor has praised the "iconic design" of the street furniture. And Department of Transportation Commissioner Iris Weinshall stated that "the distinctive street furniture will have a remarkable effect on the City streetscapes. The new coordinated designs will enliven our sidewalks, and…add to the beauty of our streets."

57.     The City's willingness to permit the display of enlarged and increased advertisements throughout the City – and indeed its own use of much of this advertising space – belies its purported concerns over the impact of arterial signs on aesthetics and safety and raises questions concerning the City's potential motive of cornering the signage market.

   iv.     *The City's Use of Private Billboards – Olympics 2012*

58.     The City has also taken every advantage of the outdoor advertising companies' arterial signs on private property when it suits its own purposes.

59.     In or about November 2004, the City sought and signed option contracts with the major outdoor advertising companies for the 2012 Summer Olympic games. Under these options, if New York City won its bid to host the 2012 Olympics, the City or the New York Committee for the Olympic Games would have had the right to use all outdoor advertising signs, including those along arterial highways, at a negotiated rate.

60.     The City's 2012 Olympic option contract included the right to use many privately owned arterial signs which had been used inconsistently with the Regulations for many years.

   v.     *Lobbying-Based Exemption – New York Bus*

61.     Finally, the City has created yet another loophole in the arterial sign ban by

amending the Zoning Resolution to exempt a narrowly crafted category of signs belonging to a single owner.

62.     The 2001 amendments to the Zoning Resolution include a curious and narrow exemption of all signs which were built prior to August 7, 2000, lie within one-half mile of any boundary of the City of New York and meet certain other detailed criteria.  ZR § 42-55(d).

63.     Upon information and belief, this exception was created in response to lobbying from Edward Arrigoni, the owner of New York Bus Service, Inc.  The exception grants non-conforming status to a cluster of signs owned by Mr. Arrigoni located on I-95 in the North Bronx and to exceedingly few other current or future signs in the City of New York.

64.     In sum, the actions of New York City, as an instrumentality of New York State, and various other state instrumentalities such as the MTA and other governmental entities, result in a regulatory scheme laden with inconsistencies and exceptions.  In light of these many inconsistencies in the regulatory scheme, the Regulations do not materially advance the government's alleged interests in traffic safety and aesthetics.

**Additional Constitutional Defect**

65.     Even apart from these many loopholes and inconsistencies in the arterial sign ban, the Regulations would not advance the state's interest for several reasons.  First, the City cannot bear its constitutional burden of demonstrating that the harms it recites are real and that the Regulations will advance them to a material degree.  The City has failed to perform any studies or rely on any empirical data demonstrating that the signs at issue actually create traffic safety issues or pose aesthetic concerns in manufacturing and commercial districts, which will remain laden with signs other than on the arterial highways.

66.     Moreover, the ban and its enforcement will have no impact on aesthetics and

traffic safety since it will not lead outdoor advertising companies to remove the sign structures. Clear Channel will simply replace the existing advertising copy on its sign structures with non-commercial copy, as is permitted under the Zoning Resolution. This is what it did following a similar ban in Houston, and what it would likewise do in New York. If the commercial advertisements pose <u>any</u> purported traffic safety or aesthetic concerns, the same structures with non-commercial copy will be no different.

**The Certification Requirements and Documentary Requirements**
**<u>Impose Unconstitutional Burdens</u>**

67.    The documentary requirements for non-conforming signs and the certification requirements in the Regulations also impose unconstitutional burdens on Clear Channel's commercial speech.

68.    The documentary requirements of Rule 49 are absurd when viewed in proper historical context. From the time non-conforming use status was granted in 1980 until the promulgation of Rule 49, outdoor advertising companies have had no idea as to what specific documents the DOB would – a quarter century later – insist were essential to non-conforming use status. Outdoor advertising companies have, for decades, routinely relied on Department cashier receipts issued for signs built on or before November 1, 1979 as proof of the status of a non-conforming sign, yet these receipts are now deemed "not sufficient." Documents such as lapsed leases or photographs of signs as of November 1, 1979, never before required but now deemed "sufficient," have been misplaced or lost since companies have had no reason to keep them. Nor have companies kept additional information now required with regard to illuminated signs, if such information ever existed at all. The DOB's own records from this time period are extremely poor. Thus, the very documents which are now required are, in most cases, long gone from both company and City files. Especially egregious is the refusal of the DOB to recognize

permits issued on cashier receipt forms as part of the optional legalization process for non-conforming signs. In short, the DOB has now deemed insufficient the very documents that it issued in 1980 when many individual non-conforming signs were legalized.

69.     In addition, the documentary requirements are particularly unreasonable since the vast majority of arterial signs built before November 1, 1979 have changed ownership on multiple occasions in the past 26 years. Not only has this led to a loss of documents, but signs were purchased on the assumption that they had long been allowed to stand as non-conforming signs.

70.     The certification requirements in the Regulations also pose significant undue burdens on the commercial speech of outdoor advertising companies including Clear Channel. These burdens are further heightened by the registration form issued by the DOB which (i) requires certification that the sign inventory complies not only with the Zoning Resolution, but with the vast number of applicable New York City rules including the Administrative Code and (ii) requires that the certifications be made on personal knowledge rather than merely on reasonable belief. Among other problems, these requirements put architects and engineers in the position of rendering difficult *legal* (rather than safety) judgments and require a voluminous amount of work. There are few, if any, registered architects or engineers in the City who have expertise in this area and fewer who would subject themselves to potential liability in rendering these legal judgments.

### AS AND FOR A FIRST CLAIM FOR RELIEF

### (Violation of First and Fourteenth Amendments:  Ban on Arterial Advertising Signs and Related Provisions – Zoning Resolution §§ 42-55 and 32-662, Local Laws 14 and 31, and DOB Rule 49)

71.     Plaintiff repeats and realleges Paragraphs 1 through 70 of this Complaint.

72.     The ban on advertising signs within 200 feet of arterial highways set forth in New

York City Zoning Resolution §§ 42-55 and 32-662, and the provisions of New York City Local

Law 14 of 2001, Local Law 31 of 2005, and Department of Buildings Rule 49, are

unconstitutional on their face and as applied to Clear Channel because they restrict Clear

Channel's commercial speech in a manner inconsistent with the First and Fourteenth

Amendments to the United States Constitution.

73.     The Regulations impose an unconstitutional burden on the commercial speech of

Clear Channel and the viewing public that cannot survive scrutiny under *Central Hudson Gas &*

*Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), and its progeny.

74.     Defendants have enacted and are enforcing the Regulations under color of state

law.

75.     An actual and justiciable controversy has arisen and now exists between Plaintiff

and Defendants concerning the constitutionality of the ban and the above-cited provisions related

to it.

76.     Plaintiff seeks a judicial determination of the rights, duties and obligations of the

parties under the Regulations, and specifically a declaration that the ban on arterial advertising

signs set forth in the above-cited Regulations and the attendant enforcement mechanisms are

invalid and unconstitutional under the First and Fourteenth Amendments to the United States

Constitution.

77.     Unless and until restrained by this Court, Defendants will continue to enforce the

Regulations against Plaintiff, including the ban on arterial advertising signs and the registration

requirements of Local Laws 14 and 31, and DOB Rule 49.  The Regulations, which require

registration with the City of all arterial signs by October 24, 2006, will require Plaintiff to

imminently take down the copy on the vast majority of its existing arterial signs, or risk

revocation of its authority to own and operate signs in the City.

78.     Unless Defendants are enjoined and restrained from engaging in said conduct, Plaintiff will be irreparably injured in that it will be deprived of constitutional rights guaranteed under the U.S. Constitution and will also suffer substantial loss of revenues, profits, customers and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain. Defendants' conduct will also cause irreparable injury to advertisers and the viewing public by depriving them of their rights under the First Amendment.

79.     Plaintiff has no adequate remedy at law to prevent or redress this irreparable injury.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### (Violation of First and Fourteenth Amendments:  Documentary and Certification Requirements – DOB Rule 49)

80.     Plaintiff repeats and realleges Paragraphs 1 through 79 of this Complaint.

81.     The certification, documentary and posting requirements for proving the "non-conforming" status of pre-1979 signs (the "Certification, Documentary and Posting Requirements") effectuated by the Regulations are unconstitutional on their face and as applied because they abridge rights secured by the First and Fourteenth Amendments to the United States Constitution in that they restrict commercial speech in a manner inconsistent with the First and Fourteenth Amendments to the United States Constitution.

82.     Defendants have enacted and are enforcing the Regulations under color of state law.

83.     An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning the constitutionality of the Certification, Documentary and Posting Requirements.

84.     Plaintiff seeks a judicial determination of the rights, duties and obligations of the parties concerning the Certification, Documentary and Posting Requirements, and specifically a declaration that the Certification, Documentary and Posting Requirements are invalid and unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

85.     Unless and until restrained by this Court, Defendants will continue to enforce the Certification, Documentary and Posting Requirements.  Unless Plaintiff complies with the Certification, Documentary and Posting Requirements, it cannot register with the City on October 24, 2006 and cannot operate in New York City.

86.     Unless Defendants are enjoined and restrained from enforcing the Certification, Documentary and Posting Requirements, Plaintiff will be irreparably injured in that it will be deprived of constitutional rights guaranteed under the U.S. Constitution and will suffer substantial loss of revenues, profits, customers and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain.  Defendants' conduct will also cause irreparable injury to advertisers and the viewing public by depriving them of their rights under the First Amendment.

87.     Plaintiff has no adequate remedy at law to prevent or redress this irreparable injury.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### (Violation of First and Fourteenth Amendments:  Content Discrimination)

88.     Plaintiff repeats and realleges Paragraphs 1 through 87 of this Complaint.

89.     The ban of commercial (but not non-commercial) arterial signs is unconstitutional on its face and as applied because the ban impermissibly distinguishes between sign messages based on whether their content is of a commercial or non-commercial nature, without any compelling government interest and by means that are not narrowly drawn, and because the ban

constitutes an unlawful prior restraint of speech regulating speech based on its content.

90.     Defendants have enacted and are enforcing the Regulations under color of state law.

91.     An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning the constitutionality of the ban of arterial advertising signs in the Regulations, while signs carrying non-commercial copy are permissible.

92.     Plaintiff seeks a judicial determination of the rights, duties and obligations of the parties concerning the Regulations, and specifically a declaration that the ban on advertising signs within 200 feet of a highway is invalid and unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

93.     Plaintiff is informed and believes and thereon alleges that, unless and until restrained by this Court, Defendants will continue to enforce and threaten to enforce the ban of arterial advertising signs against Plaintiff.  The ban will require Plaintiff to take down the signage on most of its existing arterial signs, or risk revocation of its authority to own and operate signs in the City.

94.     Unless Defendants are enjoined and restrained from engaging in said conduct, Plaintiff will be irreparably injured in that it will be deprived of constitutional rights guaranteed under the U.S. Constitution and will suffer substantial loss of revenues, profits, customers and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain. Defendants' conduct will also cause irreparable injury to advertisers and the viewing public by depriving them of their rights under the First Amendment.

95.     Plaintiff has no adequate remedy at law to prevent or redress this irreparable injury.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter judgment and orders:

1.      Declaring and decreeing that the ban on advertising signs within 200 feet of an arterial highway set forth in New York City Zoning Resolution §§ 42-55 and 32-662, and the provisions of Local Laws 14 and 31 and DOB Rule 49 are unconstitutional on their face and as applied to Plaintiff's inventory of signs in New York City, because they violate rights secured by the First and Fourteenth Amendments to the United States Constitution;

2.      Preliminarily and permanently enjoining the City of New York, the Department of Buildings and any other governmental body with authority to enforce the laws of the City of New York from enforcing (i) the ban on advertising signs within 200 feet of an arterial highway set forth in New York City Zoning Resolution §§ 42-55 and 32-662; (ii) the provisions of New York City Local Law 14 of 2001 and Local Law 31 of 2005; and (iii) the recently issued Department of Buildings Rule 49 in its entirety, as applied to Clear Channel's inventory of signs in New York City;

3.      Ordering the Defendants to rescind or revise the Regulations to ensure that they adhere to the First and Fourteenth Amendments to the United States Constitution;

4.      Granting Plaintiff reasonable attorney's fees and related costs in this action including pursuant to 42 U.S.C. § 1988; and

5.      Granting Plaintiff such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      October 6, 2006

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: _____
    Victor A. Kovner (VK 2248)
    Linda Steinman (LS 5906)
    James Rosenfeld (JR 2256)
    Kevan Choset (not yet admitted)

    1633 Broadway
    New York, New York 10019-6708
    Phone (212) 489-8230
    Fax (212) 489-8340

    *Attorneys for Plaintiff*
    *Clear Channel Outdoor, Inc.*