UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:  _____
DATE FILED: March 31, 2009
```

------------------------------------------------------------X

CLEAR CHANNEL OUTDOOR, INC.,                :                06 Civ. 8193 (PAC)

           Plaintiff,                :                OPINION & ORDER

  - against -                :

THE CITY OF NEW YORK and PATRICIA J.        :
LANCASTER, in her official capacity as
Commissioner of the New York City Department :
of Buildings,

                          :

           Defendants.

                          :

------------------------------------------------------------X
------------------------------------------------------------X

ATLANTIC OUTDOOR ADVERTISING, INC.,         :                06 Civ. 8219 (PAC)
SCENIC OUTDOOR, INC., TROYSTAR CITY
OUTDOOR LLC, and WILLOW MEDIA, LLC.,        :                OPINION & ORDER

           Plaintiffs,                :

  - against -                :

THE CITY OF NEW YORK, PATRICIA J.           :
LANCASTER, and EDWARD FORTIER,

                          :

           Defendants.

                          :

------------------------------------------------------------X
------------------------------------------------------------X

METRO FUEL LLC,                             :                07 Civ. 8244 (PAC)

           Plaintiff,                :                OPINION & ORDER

  - against -                :

CITY OF NEW YORK,                           :

           Defendant.                :

------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

The pending cases are another chapter in New York City's seven-decade attempt to control where outdoor advertising companies locate certain commercial billboards and street signs.  Since 1940, New York City's zoning regulations have banned outdoor advertising companies from placing commercial billboards, which do not advertise an on-premise business, within 200 feet and within view of the City's major parkways and roadways, also known as "arterial highways."  The City's enforcement of its zoning regulations has been inconsistent and less than vigorous.  The billboard industry has taken advantage of this lax enforcement and has consistently ignored the regulations on billboard sign location.

The first case is the consolidated action of Plaintiffs Clear Channel Outdoor, Inc., Atlantic Outdoor Advertising, Inc., Scenic Outdoor, Inc., Troystar City Outdoor, LLC, and Willow Media, LLC (together, the "Clear Channel Plaintiffs").  They own large billboards located near arterial highways in New York City.  The second case involves Plaintiff Metro Fuel, LLC ("Metro Fuel"), an owner of significantly smaller "panel" advertising signs that are situated on building fronts and poles close to the street, but are illuminated in a manner contrary to the zoning rules.

The Plaintiffs challenge the City's updated restrictions that: (1) limit the location and illumination of these commercial billboards and smaller signs; and (2) create strict permitting and registration procedures for existing outdoor signs.  The Plaintiffs claim that the restrictions infringe upon their commercial free speech rights under the First and Fourteenth Amendments to the United States Constitution, and under the New York State Constitution.  The City asserts that the regulations further its interest in improving traffic safety and aesthetics.  When put into effect the regulations will impact Plaintiffs' business revenue from the rental of outdoor advertising

signs because many existing signs will not conform to the location limitations embodied in the zoning regulations.

The Clear Channel Plaintiffs and Metro Fuel argue that the City enforces its zoning regulations unevenly, and, in certain cases, in a manner that unconstitutionally favors the City in violation of First Amendment speech protections.  Plaintiffs recognize, as they must, that the City is entitled to regulate outdoor advertising, but they argue that the City cannot regulate in the way that it intends.  Plaintiffs claim that the City's regulatory scheme is riddled with exceptions that undermine its efficacy to the point of unconstitutionality.  Notwithstanding their unlawful behavior, both sets of plaintiffs seek equitable relief in the form of a preliminary injunction against the City's enforcement of the zoning rules.  The City also moves for summary judgment against both plaintiffs, and the Clear Channel Plaintiffs and Metro Fuel cross-move for summary judgment.  For the reasons that follow, the Court holds that the Zoning Resolution's restriction on the Plaintiffs' commercial speech rights is not unconstitutional and the City may enforce the arterial highway advertising ban, the registration regulations, and the location restrictions on internally illuminated advertisements.  Accordingly, the Defendants' motions for summary judgment are GRANTED in both cases and the Plaintiffs' motions for summary judgment and a preliminary injunction are DENIED.

## BACKGROUND

The factual background applies to both the Clear Channel Plaintiffs and to Metro Fuel. The facts in this section are derived from Plaintiffs' Complaints, the parties' statements of fact submitted pursuant to Local Rule 56.1, the parties' stipulations of fact, and supporting affidavits and exhibits, unless otherwise specified.

## I.  History of New York City's Regulation of Outdoor Advertising

The claims and issues presented here cannot be fully understood without a brief recitation of the seven-decade history of New York City's regulation of outdoor advertising.  The outdoor advertising companies have long ignored or failed to comply with City regulation.  They have adopted a variety of tactics, ranging from direct challenges to the City's enforcement efforts in court; waiting until the City's enforcement fever wanes and enforcement efforts again abate; or hoping for a new administration which may have other priorities.  These defensive tactics are effective because of the City's sporadic and lackadaisical enforcement of its zoning regulations.  Time has worked to the advantage of the commercial billboard companies and the City has, at times, chosen to ignore past transgressions and instead grandfather out-of-compliance signs.

### a.  Regulation from 1940 to 2001

In 1940, New York City restricted outdoor advertising signs in districts zoned for residential use and in all areas within 200 feet and in view of arterial highways[1] and City parks larger than one-half acre. (See Declaration of Sheryl Neufeld ("Neufeld Decl.") ¶ 5; Stipulations of Fact ("SOF") ¶ 6, located at Declaration of Eric Hecker ("Hecker Decl.") Ex. 1.)  At that time the City Planning Commission ("CPC") determined that billboard regulation was needed because "[b]illboards and signs not only dominate our business streets . . . but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches."

---

[1]      New York City's definition of arterial highways includes more than 70 major expressways, boulevards, parkways, and toll crossings. See N.Y. City Zoning Resolution ("Z.R.") Appx. C: Designation of Arterial Highways. These routes include, for example, Northern Boulevard in Queens, the Harlem River Drive and Henry Hudson Parkway in Manhattan, the Jackie Robinson Parkway in Brooklyn, the Major Deegan Expressway in the Bronx, and West Shore Expressway in Staten Island. Id.  Essentially every major highway and toll crossing in New York City is an arterial highway.  The Court will refer to advertising signs located within 200 feet and within sight of arterial highways as "arterial advertising signs" throughout this Opinion and Order.

(Defendants' ("Def.") Ex. A at 90 (containing Major Reports of the City Planning Commission, 1940)).)[2]

The regulations, then and now, distinguish between "accessory use" signs, which are signs located on the premises to which the sign directs attention, and "advertising signs," which are signs that direct attention to a business or service conducted elsewhere. N.Y. City Zoning Resolution ("Z.R.") § 12-10.[3] A sign is not an advertising sign for purposes of the Zoning Resolution if it is an accessory use sign—that is, if it is promoting a business located on the premises. Id. Accessory signs are also referred to as "on-site" signs, while advertising signs are also referred to as "off-site" signs. The zoning rules enacted in 1940 distinguished between those two uses because on-site accessory use signs served the valuable economic purpose of identifying the business on the premises. (See Def. Ex. A at 90.) The Zoning Resolution permits advertising signs within the Times Square zoning district because signs in that area are "principal and traditional attractions." (Id.)

In 1961 the City adopted a comprehensive Zoning Resolution which carried on the general framework from the 1940 regulations. Of relevance to Metro Fuel's challenge, the 1961 Zoning Resolution also added certain sign location and illumination restrictions. Outdoor advertising companies, however, frequently ignored the City's ordinance and erected arterial advertising signs in violation of the zoning regulations. (See SOF ¶ 7.) In 1979-80, as the City's fiscal crisis was coming to an end, the City faced a loss of $25 million in federal highway aid, unless it complied with the Federal Highway Beautification Act and enforced provisions of its

---

[2]     Unless otherwise noted, all citations to Defendants' exhibits, declarations, or affirmations refer to exhibits submitted by the City in its case against the Clear Channel Plaintiffs. The Court will specifically note where it is referring to City exhibits submitted in the Metro Fuel case.

[3]     The City defines a "sign" as any writing, pictorial representation, emblem, flag, or any other figure of similar character, that: "(a) . . . is attached to, painted on, or in any other manner represented on a building or other structure; (b) is used to announce, direct attention to, or advertise; and (c) is visible from outside of a building." Z.R. § 12-10.

Zoning Resolution.  In 1980, after determining that enforcement was economically impracticable, the City grandfathered the outdoor signs that did not comply with the Zoning Resolution but did comply with less restrictive federal and state standards. (Id. ¶ 8.)  Thus, many signs existing on or before November 1, 1979 were granted "non-conforming use" status and remain exempt to this day from the ban on arterial advertising. See Z.R. §§ 42-55, 32-662.

Despite the exemption for pre-1980 signs and the prohibition on additional arterial advertising signs, outdoor advertising companies continued to build illegal signs.  Sometimes the billboard companies would obtain accessory-use sign permits and then illegally convert the accessory copy to off-site advertising copy. (SOF ¶ 9; see also Affirmation of Mark Geraghty ("Geraghty Affirmation") ¶¶ 32-37.)[4]  Other times, the billboard companies would not bother with subterfuge and simply erected signs with no permitting at all. (SOF ¶ 9.)  From 1980 until the late 1990s the City minimally enforced the arterial advertising restrictions. (Id. ¶ 10.)

In 1998 the City amended the Zoning Resolution to clarify that non-commercial signs were permitted wherever any other types of signs were permitted.[5]  The amendment was enacted in response to a New York State court decision in City of New York v. Allied Outdoor Advertising, Inc., 659 N.Y.S.2d 390 (Sup. Ct. Kings Co. 1997), which held that New York could not favor on-site accessory signs over non-commercial signs.  Thus, as a result of the 1998 amendments, both on-site accessory-use signs and off-site non-commercial signs were—and

---

[4]     Mark Geraghty, an attorney who has represented outdoor advertising companies since 1991, states that the combination of the "vague definitional provisions" of the Zoning Resolution and "a lack of any serious effort" by the Department of Buildings ("DOB") to dig into the accuracy of the accessory-sign applications led to "a perfect storm," which allowed "liberal interpretations" of the Zoning Resolution by outdoor advertising companies and a situation where "outdoor advertising companies systematically built signs [sic] structures with signs that were almost immediately converted to off-site advertising in plain view of everyone traveling on the City's arterial highways." (See Geraghty Affirmation ¶¶ 35-36.)  This is a polite way of saying that the billboard companies routinely built illegal signs in order to make money.
[5]     New York City defines a non-commercial sign as a "sign that contains copy regarding a governmental, charitable, religious, civic, philanthropic and/or educational organization, event or message and that does not prominently or primarily feature or make reference to a for-profit entity and/or its product(s) . . . ." (See Geraghty Affirmation Ex. E (containing New York City Department of Buildings Operations Policy and Procedure Notice #10/99).)

6

currently are—permitted within 200 feet of an arterial highway.  Off-site advertising signs are still prohibited in those areas.

    **b.  Recent Regulations: Local Law 14, Local Law 31, and Rule 49**

In February 2001, the New York City Council amended the Zoning Resolution to reduce and limit the size of all accessory signs near arterial highways and to establish size, height, and projection requirements for all signs in districts zoned as manufacturing.  The purpose of the accessory-sign size limitation was to reduce the incentive for billboard companies to illegally convert accessory signs to off-site advertising signs. (See Def. Ex. F at 2-5.)

At the same time that it amended the Zoning Resolution, the City Council also amended the Administrative Code to provide for an enhanced enforcement and penalty scheme for sign regulation.  Previous fines were so insubstantial that even when the City enforced the Zoning Resolution, the billboard companies absorbed the fines as a cost of doing business.  Mayor Giuliani signed the amendment as Local Law 14/2001 ("Local Law 14") on March 19, 2001. Local Law 14 created a registration scheme requiring all outdoor advertising companies to register their arterial signs with the Department of Buildings ("DOB"). (See Def. Ex. N §§ 26-253 to 255, 26-260.)  As part of the registration process, a company would have to include a certification from a registered architect or engineer, and an officer of the company, stating that all its arterial signs complied with the City's zoning regulations. (Id. § 26-261.)

Local Law 14 also created enhanced civil penalties of $15,000 for a first violation of the registration scheme and up to $25,000 per day for subsequent violations, plus criminal penalties and fines. (Id. §§ 26-256, 26-262.)  The DOB was empowered to bring a special nuisance abatement action to compel removal of an illegal sign or structure, and the DOB was given the

7

power to revoke a company's registration where the company made false statements in the registration application. (Id. § 26-260(d).)

None of the provisions of Local Law 14 went into effect until the DOB promulgated a rule.  Over the next two years, the City claims it was unable to promulgate the rule due to delays from litigation over the rules, the events of September 11, 2001, and an internal determination that several provisions of Local Law 14 would be impossible to implement.  Thus, in 2003, the City Council again amended the registration requirements.  The amendments were relatively minor, but they clarified that outdoor advertising companies were required to provide the DOB with an inventory of all signs within 900 feet and within view of an arterial highway.  The amendments were eventually signed into law by Mayor Bloomberg in 2005 as Local Law 31.

As before, Local Law 31 did not take effect until the DOB promulgated a rule, which it did by publishing the proposed rules in the City Record on August 15, 2005.  The DOB eventually held public hearings and the regulations—now known as Rule 49—went into effect on August 25, 2006, establishing the registration scheme that the Clear Channel Plaintiffs now challenge.[6]  The Court now turns to the precise regulations that the Plaintiffs challenge and the rationale for their claims.

## II.  The Challenged Regulations

### a.  The Clear Channel Plaintiffs

The Clear Channel Plaintiffs challenge Zoning Resolution Sections 42-55 and 32-662, the provisions of the Zoning Resolution that ban off-site advertising signs within 200 feet and within sight of arterial highways in manufacturing and commercial districts.  The Clear Channel Plaintiffs also challenge the registration and enforcement procedures set forth in Department of

---

[6]      The Court notes that the lack of any substantial activity in the eight years which have passed since Local Law 14 was enacted in 2001 to modernize the 1940 and 1961 zoning regulations is entirely consistent with the billboard industry's delaying tactics and the City's own casual efforts at enforcement.

Buildings Rule 49, which identifies how DOB will determine whether an advertising sign is a non-conforming use sign, making the sign eligible to carry off-site arterial advertising copy.

The Zoning Resolution provides that within 200 feet of an arterial highway, "(1) no permitted sign shall exceed 500 square feet of surface area; and (2) no advertising sign shall be allowed, nor shall an existing advertising sign be structurally altered, relocated or reconstructed." Z.R. § 42-55 (2001) (governing manufacturing districts); see also id. § 32-662 (2001) (governing commercial districts).[7]  Plaintiffs estimate that the total number of arterial advertising signs on private property in the City is 634 signs, while the City estimates that the number is at least 692 signs and probably higher. (See Declaration of Victor Kovner ("Kovner Decl.") ¶ 7; Declaration of Edward Fortier ("Fortier Decl.") ¶ 24 n.7.)  The Zoning Resolution also grants legal non-conforming use status to arterial signs existing on November 1, 1979.[8] Z.R. §§ 42-55, 32-662.

Rule 49 amends the Administrative Code to require that all outdoor advertising companies submit an inventory of their signs and sign structures located within 900 feet and within view of an arterial highway. See 1 Rules of the City of New York ("RCNY") § 49-15(a).[9] Advertising companies that submit an inventory which includes non-conforming signs—in other words signs exempted in 1980—must submit documentation establishing that the sign qualifies for non-conforming use status. Id. § 49-15(d)(15).  As part of that requirement, companies must submit:

---

[7]    This case only involves off-site advertising in non-residential districts.  All off-site advertising is banned in residential districts and the Plaintiffs do not challenge that restriction.  The Clear Channel Plaintiffs report that they do not possess any billboards along arterial highways in residential areas.

[8]    Plaintiffs estimate that up to 150 arterial sign faces fell under the exemption for pre-November 1, 1979 signs when the City granted the exemption (see Geraghty Affirmation ¶ 15), but neither party estimates how many signs would still qualify.

[9]    Even though outdoor advertising companies must submit an inventory of signs within 900 feet of an arterial highway, the only signs barred are the ones within 200 feet and within view of an arterial highway which are not also non-conforming signs, on-site accessory signs, or signs containing non-commercial copy.  Signs between 201 and 900 feet must either qualify as non-conforming signs or comply with size restrictions.

> Evidence that the non-conforming sign existed and the size of the sign
> that existed as of the relevant date set forth in the Zoning Resolution to
> establish its lawful status [i.e. November 1, 1979]. Acceptable
> evidence may include permits, sign-offs of applications after
> completion, photographs and leases demonstrating that the non-
> conforming use existed prior to the relevant date.

Id. § 49-15(d)(15)(b). Further:

> Affidavits, Department cashier's receipts and permit applications,
> without other supporting documentation, are not sufficient to establish
> the non-conforming status of a sign. The submitted evidence must
> specifically establish the non-conforming aspect of the sign. For
> example, where evidence is submitted to establish that a sign is a non-
> conforming advertising sign, proof that the sign was erected, but that
> does not establish that it was advertising, will not be sufficient.

Id. (emphasis added).

Along with the requirements listed above, outdoor companies must submit an "[a]ffidavit signed by the registered architect or professional engineer, that he or she reasonably believes the sign to be non-conforming based on the evidence submitted." Id. § 49-15(d)(15)(c). As part of this affidavit:

> A responsible officer of the [advertising company] shall co-sign the
> affidavit, that he or she reasonably believes the sign to be non-
> conforming based on the evidence submitted, and that to the best of his
> or her knowledge there has not been any discontinuance of the non-
> conforming use for two or more years.

Id. § 49-15(d)(15)(c)(1).

The Clear Channel Plaintiffs challenge these documentary requirements as "draconian and punitive" and claim that many of the required documents will be impossible to produce decades after their creation. Further, the Clear Channel Plaintiffs divine that the City's purpose for the registration requirements is to "eliminate from New York City's arterial highways even the non-conforming signs that had been lawful for decades." (See Geraghty Affirmation ¶ 70.)

### b.  Metro Fuel

Metro Fuel's position is different from the Clear Channel Plaintiffs.  It is generally not affected by the restriction on arterial advertising signs, as its signs are significantly smaller and not situated so as to attract the attention of drivers on arterial highways.  Rather, Metro Fuel challenges the aspects of the Zoning Resolution that control where it may place its panel advertisements and how it may illuminate those ads.

While accessory signs can be placed anywhere in commercial and manufacturing districts, subject only to size, height, illumination, and projection limitations, advertising signs are more restricted; those signs may only be placed in large commercial districts, labeled C6-5, C6-7, and C7; and, subject to illumination restrictions, in large commercial and manufacturing districts, labeled C8, M1, M2, and M3. Z.R. § 32-63, 42-52.  In the C8, M1, M2, and M3 districts (e.g. Garment District and waterfront areas) advertising signs may only be non-illuminated or indirectly illuminated. Id. § 32-645, 42-533.  The result of these regulations is that Metro Fuel's advertisement panels, due to their illumination system, may only be placed in the C6-5, C6-7, and C7 large commercial districts.  Metro Fuel challenges the provisions of the Zoning Resolution that exclude its illuminated panel advertisements from their current locations.

## III. The Parties

### a.  The Clear Channel Plaintiffs

Clear Channel is one of the largest media companies in the world.  Clear Channel operates 236 sign faces in New York City. (See Stauning Affidavit in Support of Motion for Preliminary Injunction ("Stauning Aff.") ¶ 34.)[10]  Eighty-four of these sign faces are arterial sign

---

[10]     The Court assumes that the exact number of sign faces regularly varies due to business developments.

faces,[11] and Clear Channel derives approximately $10 million in revenue yearly from these signs. (SOF ¶¶ 132, 140.)  The arterial sign faces are all illuminated and affixed to buildings or pylons. (Id. ¶ 132.)  The sign faces range in size from 11,258 square feet (a size equal to one-quarter acre) to 315 square feet, with the majority at either 1,200 square feet or 960 square feet. (Id.)

Clear Channel entered the New York market when its parent purchased Universal Outdoor Holdings, Inc., in April 1998, acquiring 34,000 outdoor advertising signs in 23 markets. (Id. ¶ 131.)  Clear Channel acquired the vast majority of its arterial signs from Universal and the rest through smaller purchases. (See Stauning Aff. ¶ 36.)  Clear Channel also built one arterial sign structure. (Id.)  When Clear Channel purchased its signs in New York, it did not perform due diligence on a sign-by-sign basis to determine which signs complied with New York's zoning laws.  Instead Clear Channel relied on representations from the sellers that they operated the signs within the law. (SOF ¶ 145.)

The City's enforcement of the Zoning Resolution substantially affects Clear Channel. The vast majority of Clear Channel's arterial sign faces do not have permits to display advertising—Clear Channel estimates that "at least" 19 of its arterial sign faces should qualify for legal non-conforming use status. (Id. ¶ 134.)  None of Clear Channel's arterial signs carried accessory advertising as of April 2008, and the signs carry only sporadic non-commercial advertising—for instance, eight sign faces carried non-commercial ads in 2005 and 13 carried non-commercial ads in 2006. (Id. ¶¶ 135-39.)

Atlantic Outdoor Advertising entered the New York City outdoor advertising market in 1997 and operates three arterial structures.  Atlantic built two of those sign structures.  The sign faces vary in size from 1,950 square feet to 1,200 square feet. (Id. ¶ 146.)  Scenic Outdoor also

---

[11]      In papers filed with the Court, Clear Channel at one point states that it has 95 arterial faces and at another point states that it has 84 arterial faces. (Compare Stauning Aff. ¶ 34, sworn on October 23, 2006, with SOF ¶ 132, filed July 28, 2008.)  The Court will use the number stipulated to by the parties, which is 84 sign faces.

entered the market in 1997 and operates five arterial sign faces on three structures. Scenic built two of the structures. The sign faces range from 1,200 square feet to 672 square feet. (Id. ¶ 147.) Troystar Corporation entered the New York City outdoor advertising business in 1995 and operates nine arterial signs on eight structures. Troystar built two of the structures, and the sign faces range from 5,760 square feet to 420 square feet. (Id. ¶ 148.) Willow Media entered the market in 1999 and operates seven arterial signs on four structures. Willow built all four structures. All the signs are 1,200 square feet, except one which is 960 square feet. (Id. ¶ 149.)

Atlantic, Scenic, Troystar, and Willow all display advertising copy without permits. The companies generally obtained only accessory-use permits for their sign faces. (Id. ¶ 151.) Atlantic, Scenic, Troystar, and Willow have rarely sold non-commercial advertisements on their arterial faces other than for a nominal fee. (Id. ¶ 153.)

As for the Individual Defendants, Patricia J. Lancaster was the Commissioner of the New York City DOB at the time the complaint was filed. Edward Fortier is the Director of the Padlock/Sign Enforcement Unit of DOB.

### b. Metro Fuel

Metro Fuel operates approximately 440 panel signs in New York City. The panel signs are 69 inches tall by 48 inches wide, or approximately 23 square feet.[12] The panels are internally illuminated, meaning that they contain posters lit from behind by fluorescent bulbs. (See Declaration of Michael Freedman ("Freedman Decl.") ¶ 2.) Enforcement of the City's zoning regulations would severely affect Metro Fuel's advertising business because 93% of Metro Fuel's signs are located in districts where internally illuminated advertising signs are prohibited. (Id. ¶ 7.)

---

[12]     In their filings, the parties repeatedly refer to Metro Fuel's panel advertisements as 24 square feet in size. If the panels are in fact 69 inches high by 48 inches wide, however, the panels are only 23 square feet in size.

Metro Fuel places the majority of its panel signs (77%) in or near parking garages, either inside the door to the garage, above or near the door, or attached to the outside of the garage. The remaining panel signs are either attached to the outside of other mixed-use properties or located in parking lots, either mounted on a pole or affixed to an adjacent building.  Metro Fuel rents space from the landlord in exchange for the right to erect these signs. (Id. ¶ 3.)  It in turn leases that space for advertising at a higher rate than its rental payments.  Metro Fuel entered the New York City market in 2006 through an acquisition of another panel sign company. (See Metro Fuel/City of New York Stipulations of Fact ("Metro SOF") ¶ 1, located in Declaration of Sheryl Neufeld ("Metro Fuel Neufeld Decl.") Ex. L.)  Most of Metro Fuel's panel signs do not have permits to display advertising. (Id. ¶ 4.)

## IV. The Exceptions to the City's Enforcement Scheme

Both the Clear Channel Plaintiffs and Metro Fuel contend that the City's regulatory and enforcement scheme is so riddled with exceptions and inconsistencies as to undermine the very point of the regulations, thus making the relevant aspects of the Zoning Resolution an unconstitutional restraint on speech.

The Court examines the exceptions that the Plaintiffs claim support their cases.

### a.  Billboards on Government Property

#### i.  Signs on City Property

Despite its own zoning regulations and ban on arterial advertising signs, New York City has utilized arterial advertising on City property.  Starting in 1998 the City licensed Clear Channel to display advertising on two 960-square-foot arterial billboards on City property within view of the Belt Parkway in Brooklyn. (SOF ¶ 13.)  The City terminated the agreement as of January 1, 2008 and requested that Clear Channel remove the signs. (Id. ¶ 14.)

Another exception occurred in 2005 when New York City acquired the "High Line," an inactive rail structure on Manhattan's West Side which had several arterial billboards. The City negotiated with Clear Channel and with another media company to operate advertisements on those billboards. Following commencement of this litigation, the City declined to execute any agreements, but even so, both Clear Channel and the other media company operated arterial advertising signs on the High Line with the City's permission until July 2007. (Id. ¶ 17-23.)

Further, the Yankee Stadium parking lot, which is under the New York City Parks Department's jurisdiction, contains a 1,248-square-foot double-faced arterial billboard. While the application to erect the sign contained assurances that the sign would be used exclusively as an accessory business sign to Yankee Stadium, the billboard contains both off-site advertising copy and non-commercial copy. In 1984 the DOB notified the Yankees that they must eliminate the advertising components of the sign or seek a variance. In light of the billboard industry's conduct, it should come as no surprise that the Yankees complied with neither option—and the City took no further steps to enforce the Zoning Resolution. (Id. ¶ 24-26.)

As part of negotiations with the Yankees over the new Yankee Stadium, the City agreed in 2006 to permit the Yankees to operate three additional arterial billboards near the new stadium. As of early January 2009, the Yankees had not erected any of these billboards, and the 2006 agreement with the City requires the Yankees to follow zoning laws and regulations. (See SOF Ex. H at 23.) In response to a request by this Court, the City specifically confirmed that the new Yankee billboards will be subject to the provisions of the Zoning Resolution restricting off-site arterial advertising signs. (See Jan. 14, 2009 Letter from Sheryl Neufeld ("Jan. 14, 2009 Neufeld Letter") at 3.)

There are two 600-square-foot arterial billboards on City-owned property near the West Side Highway at 145th Street.  These billboards have been on City land since 1995, but the City recently settled a holdover proceeding and the signs' operator was required to remove the billboards and structures by September 30, 2008.[13] (SOF ¶ 15-16.)

The City also permitted outdoor advertising companies to operate arterial advertising billboards on City land in Staten Island along the West Shore Expressway from 1994 until 2002, and in the Bronx along the Major Deegan Expressway from 2002 until 2008.  The City has terminated these agreements. (Id. ¶ 27-30.)

Finally, in connection with the City's bid to host the 2012 Summer Olympics, the City, working through a non-profit organization called NYC 2012, required all major outdoor advertising companies to agree to make their billboards available to Olympic sponsors during the Games. (Id. ¶ 117-18.)  While these billboards were not on City land, the negotiated arrangement would have made almost every billboard in the City—including arterial billboards—under the control of a quasi-City agency for a seven-week period.

### ii.  Signs on MTA, Port Authority, and Amtrak Property

In addition to these signs on City property, there are approximately 75 arterial billboards on property belonging to the Metropolitan Transit Authority ("MTA"), the Port Authority of New York and New Jersey (the "Port Authority"), and Amtrak. (See Stauning Aff. Ex. 13.)  The parties disagree over the City's reasons for not enforcing its laws on these properties and the City's good faith in prospectively enforcing the Zoning Resolution.

The City did not enforce the Zoning Resolution against the MTA because, City officials claim, they believed that they did not have the authority to do so. (See Declaration of Phyllis

---

[13]     Upon later inquiries from the Court as to whether these signs had been removed as scheduled, the City reported that it had taken diligent steps to enforce an eviction notice, and that those steps continue.  The City now expects the signs to be removed by June 30, 2009.

Arnold ("Arnold Decl.") ¶ 66; Geraghty Affirmation Ex. F at 2.)  City officials held this belief despite a 1982 "Informal Opinion" issued by the New York State Attorney General stating that "the City of New York may provide for the removal of commercial billboards erected in violation of its zoning law on property owned by MTA . . . ." See 1982 N.Y. Op. Atty. Gen. (Inf.) 107, 1982 WL 178319, at *4 (Dec. 28, 1982).  In conjunction with this litigation, the City now recognizes that it has the legal authority to enforce the Zoning Resolution against arterial signs on "non-New York City Transit Authority property that is owned or controlled by the MTA (e.g., Long Island Rail Road ("LIRR") and Metro North property)." (See Arnold Decl. ¶ 68.)  The City apparently cannot enforce the Zoning Resolution against property under the Transit Authority's jurisdiction. (Id. ¶ 68 n.12; N.Y. Pub. Auth. Law § 1204(13-a).)  Plaintiffs urge that the City surrendered its authority to do so when it acquiesced in the legislation.  Going forward, the City states that it will enforce the Zoning Resolution against the MTA, with the exception of property controlled by the Transit Authority, in the same manner as it would against private owners. (Arnold Decl. ¶ 69.)[14]

Signs controlled by the Port Authority and Amtrak are in the same position as signs on MTA property.  The City claims that for years it mistakenly believed it did not have the authority to regulate those entities, but, in conjunction with these lawsuits, it now believes that it does.  Going forward, the City states that it will regulate the Port Authority property—with the exception of the World Trade Center—and Amtrak property in the same manner as private property. (Id.)[15]

---

[14]    There are approximately 28 arterial advertising signs on Transit Authority property and 22 arterial signs on the MTA's LIRR property. (See SOF ¶¶ 32, 34.)

[15]    There are three arterial advertising signs on Port Authority property and 17 signs on Amtrak property. (See SOF ¶¶ 48, 49, 55.)  Additionally, there is one arterial sign on U.S. Government property at the U.S. Post Office along the West Side Highway in Manhattan. (Id. ¶ 59.)  The City states that it will research whether it has authority to enforce the Zoning Resolution against United States property. (See Arnold Decl. ¶ 68.)

**b.  Street Furniture and Phone Kiosk Advertising**

The City has a contract with a private company, Cemusa, Inc., to install and maintain bus shelters, automatic public toilets, and newsstands (the "Street Furniture Franchise").  Plaintiffs, primarily Metro Fuel, argue that this contract allows Cemusa to operate advertising displays that are similar to their advertisements, but which are not included in enforcement of the Zoning Resolution.

The City and Cemusa entered into a 20-year Street Furniture Franchise agreement in 2006, under which Cemusa will replace and build up to 3,500 bus shelters, replace at least 284 newsstands, and potentially build another 330 newsstands. (See SOF ¶¶ 62, 63, 83.)  The new bus shelters may contain up to 55 square feet of back-lit advertising.[16]  There is no restriction on displaying such advertisements in any district of the City or within 200 feet and within view of an arterial highway.[17] (Id. ¶¶ 65-67.)  Many of these new advertisements will contain rotating signs, and other advertisements may use electronic media. (Id. ¶ 68.)  The Street Furniture Franchise also allows newsstands to bear advertising for the first time, permitting up to 82.5 square feet of advertising. (Id. ¶ 83.)

The contract calls for the City to receive at least 50% of gross revenue derived from the Street Furniture Franchise, and more than $1 billion over the 20 years of the agreement due to guaranteed compensation and advertising revenues. (Id. ¶¶ 85-87.)  The Zoning Resolution's restrictions are not applicable to the street furniture advertising signs.  The City states that the Zoning Resolution covers the City's buildings and land, but "does not govern the use or development of the City's streets and sidewalks." (See Defendant's Response to Plaintiff's First

---

[16]    The City permitted old bus shelters to have up to 47 square feet of advertising.

[17]    The use of back lighting on the bus shelter advertisement is restricted only in areas prohibited by the regulations of the Landmarks Commission.

Consolidated Set of Discovery Demands, at 18, located at Hecker Decl. Ex. 26.)  Since bus shelters and newsstands are on sidewalks, they are not covered by the Zoning Resolution.

Plaintiffs also argue that the City further dilutes the Zoning Resolution's effectiveness by allowing advertisements on phone kiosks, lamppost banners, and taxicabs.

### c.   Fresh Direct Sign

Plaintiffs point to the Fresh Direct sign, a single billboard advertising the food delivery company along the Long Island Expressway in Queens, as evidence that the City unconstitutionally permits loopholes in its enforcement scheme.  The City issued an accessory permit for the digital billboard, which advertises both the food delivery company Fresh Direct and the products sold through Fresh Direct.  In 2002, following a DOB enforcement proceeding against the sign's owners for using the billboard for non-accessory purposes, an Administrative Judge ruled that the Fresh Direct sign was an accessory use.  The City now states that the sign is an accessory use because 51% of the billboard copy directs attention to the business on the lot, Fresh Direct. (SOF ¶¶ 129-30.)

### d.   "New York Bus" Exemption

The Zoning Resolution codifies one other exception to the ban on arterial advertising. Zoning Resolution § 42-55(d) grants legal non-conforming use status to signs that are within one-half mile of any of the City's boundaries, were built prior to August 7, 2000, and are along any designated arterial highway that is also:

> (1) a "principal route" or "toll crossing" that prohibits direct vehicular access to abutting land and provides complete separation of conflicting traffic flows; and
>
> (2) a through truck route designated by the New York City Department of Transportation; and
>
> (3) that crosses a boundary of the City of New York.

Z.R. § 42-55(d).

Plaintiffs argue that the City created this narrow exception to exempt the signs belonging to one politically connected businessman who owns billboards along Interstate 95 near New York City's border with Westchester County. Plaintiffs provide evidence that one company, New York Bus Service, Inc., owns eight billboards along I-95 on New York City's northern border. (See Stauning Aff. Ex. 42.) The City, however, argues that this exception to the restriction on arterial advertising signs was intended only to "aid New York City outdoor advertisers in maintaining a competitive equality with advertisers that operate immediately outside of the City's boarders [sic]." (See Neufeld Decl. ¶ 20.)

## V.  Procedural History

Clear Channel first filed its complaint against the Defendants on October 6, 2006. Four days later, on October 10, Atlantic Outdoor, Scenic Outdoor, Troystar City Outdoor, and Willow Media filed their complaint against Defendants. The Court consolidated the actions on October 20, 2006, pursuant to Federal Rule of Civil Procedure 42(a). On October 24 and November 1, 2006, respectively, Clear Channel and Atlantic Outdoor, Scenic Outdoor, Troystar City Outdoor, and Willow Media filed motions for a preliminary injunction to prevent the City from enforcing the arterial advertising restrictions and the provisions of Local Law 14 (2001), Local Law 31 (2005), and DOB Rule 49 (2006). The City subsequently agreed to stay the enforcement of the challenged regulations until the Court resolved the motion for preliminary injunction. Following discovery and the filing of an amended complaint, the City moved for summary judgment on May 12, 2008, pursuant to Rule 56 of the Federal Rules of Civil Procedure. On June 23, 2008, the Clear Channel Plaintiffs cross-moved for summary judgment.

Metro Fuel filed its complaint against the City on September 21, 2007, and this Court accepted the case as related to Clear Channel. Metro Fuel filed a motion for summary judgment or preliminary injunction on July 28, 2008, and the City cross-moved for summary judgment against Metro Fuel on August 25, 2008.[18]

The motions in the cases were fully briefed on October 23, 2008, and the Court held oral argument jointly with the Clear Channel Plaintiffs, Metro Fuel, and Defendants on December 1, 2008.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material

---

[18]     On September 19, 2007, the City agreed that it would not enforce the Zoning Resolution against Metro Fuel's then-existing 360 panel signs until 10 days after a decision by this Court. (See Metro Fuel Neufeld Decl. Ex. NN.)

facts. Fed. R. Civ. P. 56(e).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001).  Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration. <u>Id.</u>

## II.  Preliminary Injunction Standard

To obtain a preliminary injunction, the moving party must show that it is likely to suffer irreparable harm without the requested relief, as well as either: (1) a likelihood of success on the merits; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." <u>Citibank, N.A. v. Citytrust</u>, 756 F. 2d 273, 275 (2d Cir. 1985) (citing <u>Mamiya Co. v. Masel Supply Co.</u>, 719 F.2d 42, 45 (2d Cir. 1983)).  Where a party seeks to enjoin government action "taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." <u>Jolly v. Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996) (internal quotations omitted).  The party seeking the injunction "must show a 'clear' or 'substantial' likelihood of success where the injunction sought is mandatory—i.e., it will alter, rather than maintain, the status quo." <u>Sunward Elecs., Inc. v. McDonald</u>, 362 F.3d 17, 24 (2d Cir. 2004).  Because this case involves a City regulatory scheme enacted in the public interest, and because Plaintiffs seek to alter the status quo by preventing the City from enforcing a duly enacted regulation, Plaintiffs must show a substantial likelihood of

success on the merits. See County of Nassau v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008) (applying more rigorous "substantial likelihood of success on the merits" standard where county challenged interpretation of new law by Department of Health and Human Services); Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir. 2000) (applying higher standard for injunction where plaintiffs challenged the adequacy of emergency housing administered by the New York City Human Resources Administration).

Irreparable harm "means injury for which a monetary award cannot be adequate compensation." Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).  Additionally, the "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." Reuters, Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).  A loss of First Amendment rights is generally deemed irreparable harm, particularly where the injury is the result of a government regulation. See Field Day, LLC v. County of Suffolk, 463 F.3d 167, 181 (2d Cir. 2006); Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.").  If the Court were to find Plaintiffs' First Amendment claims credible, it would necessarily have to find that the Plaintiffs suffered irreparable harm.  The essential inquiry in this dispute is whether those First Amendment claims are convincing.[19]

## III.  Commercial Speech Regulation

The First Amendment, as applied to the states through the 14th Amendment, protects commercial speech from unwarranted governmental regulation.[20] See Va. Pharmacy Bd. v. Va.

---

[19]     To the extent that there are questions about whether the Clear Channel Plaintiffs can make a claim in equity when they may have "unclean hands" in the dispute, the City does not raise this argument.
[20]     The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

Citizens Consumer Council, 425 U.S. 748, 761 (1976) ("[S]peech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another.").  But courts recognize a distinction between commercial speech and other varieties of speech, and typically accord a lesser protection to commercial speech than to other constitutionally guaranteed expressions.  See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 637 (1985) (commercial speech receives "protection somewhat less extensive than that afforded noncommercial speech") (internal quotations omitted); Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456-57 (1978).  Further, "within the class of regulations affecting commercial speech, [courts] accord varying levels of protection depending on the type of commercial speech at issue." N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health, 556 F.3d 114, 132 (2d Cir. 2009).  For instance, government restrictions targeting commercial messages which are either "more likely to deceive the public than to inform it" or "related to illegal activity" survive constitutional scrutiny. See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 563-64 (1980) (citations omitted).

Where a communication is neither misleading nor related to illegal activity, the state must demonstrate its interest in restricting the speech, and the regulatory technique must be in proportion to that interest. Id. at 564 ("Compliance with this requirement may be measured by two criteria.  First, the restriction must directly advance the state interest involved . . . Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.").  In the seminal case of Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557 (1980), the Supreme Court set out the four-part test to determine the constitutionality of commercial speech restrictions such as the ones challenged here.

The <u>Central Hudson</u> test asks the following: (1) is the expression protected by the First Amendment; (2) is the asserted governmental interest substantial; (3) does the regulation directly advance the governmental interest asserted; and (4) is the regulation more extensive than necessary to serve that interest. <u>Id.</u> at 566.  The burden is on the government to satisfy the test. <u>See</u> <u>Bolger v. Youngs Drug Prods. Corp.</u>, 463 U.S. 60, 71 n.20 (1983) ("The party seeking to uphold a restriction on commercial speech carries the burden of justifying it.").  There is little dispute here that the first and second factors of the <u>Central Hudson</u> test are satisfied.  Plaintiffs' challenges deal with the third and fourth prongs.[21]  Courts often interchange the elements of these last two prongs, and the Supreme Court has noted that "the last two steps of the <u>Central Hudson</u> analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." <u>United States v. Edge Broad. Co.</u>, 509 U.S. 418, 427-28 (1993) (quoting <u>Posadas de P.R. Assocs. v. Tourism Co. of P.R.</u>, 478 U.S. 328, 341 (1986)).  In other words, the zoning regulation must be reasonable in its relation to its subject and adopted in the public interest.

Before analyzing the Plaintiffs' arguments, the Court discusses how the <u>Central Hudson</u> test has been applied in the unique category of billboard regulation and in situations involving "underinclusive" speech restrictions.

### a.  The <u>Metromedia</u> Decision

In <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490 (1981), the Court considered a sign ordinance that prohibited all outdoor advertising signs except for on-site accessory signs and

---

[21]     The Clear Channel Plaintiffs conceded at oral argument that they were only challenging the third and fourth prongs of <u>Central Hudson</u>. (<u>See</u> Dec. 1, 2008 Clear Channel Oral Argument Tr. ("Clear Channel Tr.") 24:07-11.) Metro Fuel stated at oral argument that it had "a mixed reaction" to the second prong, but it seemed to concede that its strongest objections were on the third and fourth prongs. (<u>See</u> Dec. 1, 2008 Metro Fuel Oral Argument Tr. ("Metro Fuel Tr.") 18:17-19:21.)

signs that fell into 12 specified categories.[22] Id. at 494-95.  A majority of the Court found that the ordinance did not violate the First Amendment by allowing on-site commercial advertising while forbidding off-site commercial advertising. Id. at 511-12 (finding that San Diego could value one type of commercial speech over another type).  Applying the Central Hudson test, the Court found that the "serious" question was whether the ordinance passed the third prong—whether the law directly advanced the government's interest in traffic safety and the appearance of the city. Id. at 508.  The Court accepted the legislature's judgment that the ordinance improved traffic safety, and the Court found no reason to carefully scrutinize the city's aesthetic desires because there was no claim that San Diego had an ulterior motive in suppressing speech. Id. at 509-10. Finally, the Court found that the "apparent incongruity" of allowing some billboards while rejecting others, when the effect of both is the same on traffic and beauty, did not create a constitutional problem because the city was permitted to value one type of commercial speech over another, as long as the determination was reasonable. Id. at 511-12 ("underinclusive" ordinance permitted).

A plurality of the Court found that the law violated the First Amendment in two manners. First, the law improperly protected commercial speech over non-commercial speech by granting an exception to on-site accessory signs, but not to non-commercial signs. Id. at 513 ("Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages.").  Second, a plurality found that San Diego could not pick and choose among various

---

[22]     The exempted categories included:

> [G]overnment signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and '[temporary] political campaign signs.'

Metromedia, 453 U.S. at 494-95 (citing the relevant city ordinance).

types of non-commercial speech based on its content. Id. at 514-15 (finding that if the City allowed some types of non-commercial messages on billboards, it must allow other types of non-commercial messages).  The Court overturned San Diego's ordinance because the regulation banned non-commercial advertising signs and thus reached "too far into the realm of protected speech." Metromedia, 453 U.S. at 521.

Metromedia is the flag-bearer for billboard-regulation cases.  Metromedia stands not just for the proposition that a City may favor on-site accessory advertising and non-commercial off-site advertising over commercial off-site advertising, see, e.g., Infinity Outdoor, Inc. v. City of New York, 165 F. Supp. 2d 403, 416 (E.D.N.Y. 2001) (listing cases); it has also been extensively cited for the theory that "state interests in traffic safety and esthetics may justify zoning regulations for advertising." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 551 (2001); see also Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 808 (1984); Long Island Bd. of Realtors, Inc. v. Vill. of Massapequa Park, 277 F.3d 622, 627 (2d. Cir. 2002) (where purpose of sign ordinance was to "preserve aesthetic value and reduce hazards," it followed that "[o]n their face, such regulations directly advance the Village's interest in aesthetics and safety") (citing Metromedia, 452 U.S. 508-12).

**b.  Underinclusive Speech Restrictions: Rubin and Greater New Orleans**

Plaintiffs do not contend that Metromedia is inapplicable in this case.  Instead, Plaintiffs argue that the City's Zoning Resolution fails under the Central Hudson test because the City cannot prove what San Diego was able to show in Metromedia—that San Diego's underinclusive speech regulation still directly advanced its interests.  New York City cannot show this, Plaintiffs argue, because the regulations hypocritically permit some commercial off-site advertising while restricting other commercial off-site advertising, but without a valid basis for the distinction and

in such a widespread manner as to undermine the point of the regulations.  Specifically, Plaintiffs argue that the City undermines the very point of its Zoning Resolution by allowing commercial billboards on City-controlled land and advertisements on franchised bus shelters.  To support their position, Plaintiffs rely on two Supreme Court cases that overturned speech restrictions where the regulations were underinclusive.

In Greater New Orleans Broadcasting Association, Inc. v. United States, 527 U.S. 173 (1999), a federal regulation prohibited broadcasters from advertising privately owned casinos, but permitted advertising for state-run lotteries or casinos operated by Indian tribes. Id. at 176-80.  The Court found that the government regulation was "so pierced by exemptions and inconsistencies" that it could not pass Central Hudson's third prong. Id. at 190.  The Court found that the exemptions in the law "directly undermined and counteracted its effects" so as to create "little chance that the speech restriction could have directly and materially advanced its aim," which was to reduce the social costs associated with gambling. Id. at 193 (citations and quotation omitted).

Greater New Orleans built upon an earlier case, Rubin v. Coors Brewing Company, 514 U.S. 476 (1995), where the Bureau of Alcohol, Tobacco and Firearms ("BATF") banned beer makers from listing the alcohol content on beer labels because, the BATF argued, the ban would prevent "strength wars" among brewers. Id. at 478-49.  Applying the third prong of Central Hudson, the Court found that the government's regulatory scheme was "irrational[]" because, under another set of federal laws, brewers were able to advertise the strength of their alcoholic content. Id. at 488.  The inconsistency of the laws created "little chance" that the regulation at issue could directly advance the government's purpose. Id. at 489.  Secondly, the Court found that the regulation did not pass the fourth prong of Central Hudson because the government had

other regulatory options that were less intrusive to the defendant's First Amendment rights. Id. at 491.

Plaintiffs argue that the principles of Greater New Orleans and Rubin govern this case. While Plaintiffs agree that Metromedia allows for some underinclusiveness in laws regulating speech, they argue that the City's Zoning Resolution restricting arterial advertising and panel advertising is so hypocritical that it pushes the regulations into the realm of Greater New Orleans and Rubin.

The Court now turns to its analysis of the Clear Channel Plaintiffs' and of Metro Fuel's claims.

## IV. Application to Clear Channel Plaintiffs

The Clear Channel Plaintiffs challenge: (1) the provisions of the Zoning Resolution that ban off-site advertising signs within 200 feet and within sight of arterial highways in manufacturing and commercial districts; and (2) the registration provisions of DOB Rule 49. Both regulations involve a restriction on speech and fall under the Central Hudson analysis. Because the challenge to the registration provisions of Rule 49 also involves a preliminary matter—whether the claim is ripe for review—the Court analyzes each challenge individually.

### a. Arterial Advertising Ban

Under Central Hudson's first prong—whether the First Amendment protects the expression—neither party disputes that off-site arterial advertising is protected. The advertising at issue is not deceptive and it does not promote illegal activity; it is protected commercial speech. See Central Hudson, 447 U.S. at 563-64. Nor do the Clear Channel Plaintiffs argue that the City fails to satisfy the second prong, that the City's asserted interests are substantial. The City's interests in promulgating the restrictions on arterial advertising are to improve traffic

safety and aesthetics, as evidenced by the discussions in the City Planning Commission's 1940 report on the zoning amendments (see Def. Ex. A at 90), by the CPC's 2000 report on the Zoning Resolution (see id. Ex. F at 2), and by Mayor Giuliani's statements when signing Local Law 14 (see id. Ex. O at 3-4).  There is ample case law establishing that traffic safety and aesthetics constitute substantial government interests. See, e.g., Taxpayers for Vincent, 466 U.S. at 807; Metromedia, 453 U.S. at 507-08.  The real issues are Central Hudson's third and fourth prongs.

In analyzing Central Hudson's third element—whether the regulation directly advances the asserted governmental interest—this Court must determine how much underinclusivity is permitted in the arterial advertising regulations before the regulations fail to materially advance the City's interests.  There is little question, however, that without taking into account the exceptions that the Plaintiffs highlight, the City's regulations directly and materially advance the City's interests.  In the billboard industry's challenge to the same arterial ban in 2001, Judge Gershon of the Eastern District of New York held that the City's regulation directly and materially advanced the City's interest. See Infinity Outdoor, 165 F. Supp. 2d at 417.  Although the posture of that challenge was different because the Plaintiff argued that the City's arterial advertising ban violated the First Amendment by banning advertising signs but permitting non-commercial signs, the regulations at issue were the same.  Judge Gershon applied Central Hudson and, under the third prong, held that both the history of the City's zoning laws and "the 'accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety' is sufficient to satisfy the third step of Central Hudson." Id. (quoting Metromedia, 453 U.S. at 509).[23]

---

[23]     The Clear Channel Plaintiffs claim that even without the exceptions, the arterial advertising restrictions would not materially advance the City's interests because the outdoor advertising companies would transfer any illegal advertising signs into non-commercial signs, thus making the signs legal.  Clear Channel argues that it accomplished such a transition with 400 signs in Houston in 2003 when that city enacted a similar law. (See

The Plaintiffs claim that the numerous exceptions to the Zoning Resolution riddle the entire regulatory structure—the exceptions swallow the rule.  The Court now turns to whether these supposed inconsistencies fatally compromise the City's scheme for regulating arterial advertising signs.

Greater New Orleans and Rubin hold that "self-defeating speech restrictions will violate the First Amendment." See Metro Lights, LLC v. City of Los Angeles, 551 F.3d 898, 906 (9th Cir. 2009) (citing Greater New Orleans, 527 U.S. at 190).  But those two cases involved the content of the speech allowed (advertising for gambling allowed and prohibited; strength of alcohol content allowed and prohibited) and not the location of the message.  This case involves regulation of billboard location, not the content of the speech.  As Metromedia discusses and makes clear, the law of billboard regulation is distinct from other speech regulation. See Metromedia, 453 U.S. at 501 ("Each method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method."); see also N.Y. State Rest. Ass'n, 556 F.3d at 132 ("[W]ithin the class of regulations affecting commercial speech, we accord varying levels of protection depending on the type of commercial speech at issue.").  To demonstrate how the principles of Greater New Orleans and Rubin apply

---

Affidavit of Michelle Costa ("Costa Aff.") ¶¶ 6-10.)  Even though the revenue from non-commercial advertising is lower, Clear Channel argues that the high cost of removing billboard structures makes it more economical to convert signs to non-commercial copy and earn additional revenue by charging phone companies rent to post antennae on the structures.  The Infinity court rejected this "heads-I-win-tails-you-lose" economic cost-benefit argument, 165 F. Supp. 2d at 418-19, and this Court does as well.  The City presents evidence that the CPC, in amending the Zoning Resolution in 2001, considered the proliferation of vinyl advertising signs, which are relatively easy to install and dismantle. (See Def. Ex. F at 2-4.)  It makes sense that many of these signs would be removed and not converted to non-commercial copy if the arterial ban was upheld.  Additionally, Clear Channel's history of posting non-commercial copy in New York City is not a robust one.  Eight of Clear Channel's arterial billboards carried non-commercial ads in 2005, and 13 arterial billboards carried such ads in 2006.  As of April 2008, no Clear Channel arterial billboard carried non-commercial copy.  But even if the Court put stock into Clear Channel's conversion argument, Supreme Court precedent directs this Court to also give weight to the common-sense judgment of legislators that their restrictions on speech will have the desired effect. See Lorillard Tobacco, 533 U.S. at 555; Metromedia, 453 U.S. at 509.  Here, New York City has ample reason to believe that its arterial restrictions will directly impact the number of arterial advertising signs in the City, and that these signs will not overwhelmingly be transferred to non-commercial copy.

to billboard regulation, the Plaintiffs rely on two District Court cases from Los Angeles: World Wide Rush, LLC v. City of Los Angeles, 563 F. Supp. 2d 1132 (C.D. Cal. 2008), and Metro Lights, LLC v. City of Los Angeles, 488 F. Supp. 2d 927 (C.D. Cal. 2006).  Plaintiffs strongly urged the Court to accept Metro Lights as correct, but, unfortunately for Plaintiffs, it was reversed on appeal. See Metro Lights, LLC v. City of Los Angeles, 551 F.3d 898 (9th Cir. 2009).[24]

In World Wide Rush, the District Court found that a Los Angeles regulation banning off-site advertising signs within 2,000 feet of a freeway failed the Central Hudson test because the city "permitted multiple commercial signs" within 2,000 feet of a freeway, undermining the city's interests in traffic safety and aesthetics. 563 F. Supp. 2d at 1152.  The court found that Plaintiffs showed three instances where the city permitted "giant commercial billboards" to stand within 2,000 feet of a freeway, and the court held that this was enough to satisfy the undermining standard of Greater New Orleans. Id. at 1150-51.

Plaintiffs urge this Court to follow World Wide Rush, where there appeared to be significantly fewer exceptions to the billboard ban than exist in this case.  Assuming that Greater New Orleans has any applicability in the billboard world, it was applied far too strictly.  The World Wide Rush court found that "preserving even one freeway-facing sign still undermines the City's stated interests in traffic safety and aesthetics." Id. at 1151.  This all-or-nothing approach misinterprets the reasoning of Greater New Orleans, which overturned the commercial speech restriction there because one part of the regulatory regime permitted certain content while

---

[24]        At oral argument Plaintiffs also presented the Court with a third California case which they claim supports their position, Metro Fuel, LLC v. City of San Francisco, No. C 07-06067 JSW (N.D. Cal. Nov. 12, 2008). Plaintiffs handed the Court a "Notice of Tentative Ruling and Questions" from that case, which Plaintiff Metro Fuel described as a common practice of West Coast courts to provide a tentative ruling in advance of argument, listing questions the parties should address at the hearing.  This notice is by nature only a tentative decision, and the Court fails to see its precedential value to this case.  The Court does not take the notice into account.

another part banned the same content.  Obviously the regime was internally contradictory.

Further, banning billboards within 2,000 feet of Los Angeles' freeway system is not at all like

the much shorter 200-foot level specified in the City's Zoning Resolution.  Finally, as Ralph

Waldo Emerson famously said, "A foolish consistency is the hobgoblin of little minds," and the

First Amendment does not mandate perfect consistency. See, e.g., Trans Union Corp. v. Fed.

Trade Comm'n, 267 F.3d 1138, 1141 (D.C. Cir. 2001) (restriction on target marketing not

unconstitutional under Greater New Orleans where law had "just one exception"); Paradigm

Media Group, Inc. v. City of Irving, No. 3:01-CV-612-R, 2002 WL 1776922, at *7 (N.D. Tex.

2002), aff'd, 2003 WL 1922999, 65 Fed. Appx. 509 (5th Cir. 2003) (sign ordinance banning off-

site advertising signs with exception for signs at two sports facilities not an unconstitutional

restraint on speech).  Greater New Orleans holds that when the regulation at issue is riddled by

exceptions, contradictions, and internal inconsistencies as to what content can be delivered, it no

longer passes constitutional muster.  But that is not even remotely the case here, and the Court

declines to follow World Wide Rush's overly strict reading of underinclusivity.

The second Los Angeles District Court case that Plaintiffs rely on is Metro Lights, 488 F.

Supp. 2d 927, which the Ninth Circuit overturned subsequent to the briefing and oral argument

in this case. See Metro Lights, 551 F.3d at 914.  The District Court in Metro Lights found that

under Greater New Orleans, Los Angeles could not ban commercial off-site signs while creating

an exception for advertisements on city-controlled street furniture. 488 F. Supp. 2d at 931-32.

The Plaintiff in that case was a panel advertising company much like Plaintiff Metro Fuel, and

Los Angeles' street furniture program was substantially similar to New York City's agreement

with Cemusa. Id. at 933, 935-36.  The Clear Channel Plaintiffs and Metro Fuel, in particular,

naturally placed great reliance on the District Court decision, and urged the Court to follow its

logic.  On January 6, 2009, however, the Ninth Circuit overturned the decision on several

grounds. See Metro Lights, 551 F.3d at 908-11.[25]  In doing so the Ninth Circuit shredded the

logic of the District Court's decision.

First, the Ninth Circuit stated that in Metromedia, the Supreme Court allowed San Diego

to restrict all off-site advertising, but permitted an exception for such advertising on bus-stop

benches. Id. at 908-09.  Thus, since Metromedia had allowed an exception for ads on bus

shelters, it followed that Los Angeles' ordinance, which also permitted such an exception for the

street furniture franchise, was permissible. Id. at 909 ("[W]e must conclude that Metromedia is

essentially indistinguishable from this case insofar as the challenged ordinances, in their

commercial applications, are concerned.").  Further, the Ninth Circuit held that Metromedia

allowed Los Angeles to value one type of speech—"controlled offsite advertising on public

transit facilities"—more than another type of speech—"uncontrolled offsite advertising spread

willy-nilly about the streets." Id. at 910.

Most relevant to the Clear Channel Plaintiffs, the Ninth Circuit held that the ordinance

was not so inconsistent as to fail under Greater New Orleans. Id. at 911.  Greater New Orleans

did not apply because Los Angeles' street furniture franchise "allows the City to put a firm cap

on the quantum of advertising it allows," and "does not work at inexorable cross-purposes to"

Los Angeles' goals of traffic safety and aesthetics. Id.  Importantly, the court found that

"[a]lthough the [street furniture franchise] permits some advertising, a regime that combines the

Sign Ordinance and the [franchise] still arrests the uncontrolled proliferation of signage and

thereby goes a long way toward cleaning up the clutter, which the City believed to be a worthy

---

[25]     Upon the Plaintiffs' request the Court allowed the Clear Channel Plaintiffs, Metro Fuel, and the City to submit supplemental briefs on the impact of the Ninth Circuit's decision.

legislative goal." Id.  The Ninth Circuit thus upheld the principle that not all exceptions to a speech regulation force the regulation to fail under Central Hudson prong three.

The Court returns to the crucial question: is New York City's arterial advertising restriction so pierced by inconsistent application that it fails to directly advance the City's traffic and aesthetic goals?  The Court finds that the exceptions, limited in their number and still being reduced, do not so undermine the Zoning Resolution.  As a result of the Zoning Resolution the Clear Channel Plaintiffs will be forced to remove—or convert to non-commercial copy—dozens of large, distracting billboard signs near arterial highways which should never have been erected in the first place.  Billboards belonging to other outdoor advertising companies not parties to this case will presumably also come down.  The City has stated that it will enforce the Zoning Resolution against the MTA, Port Authority, and Amtrak, where the law allows, and against itself, so many more arterial advertising billboards should also be removed.  Enforcement of the Zoning Resolution will further prevent the illegal erection of future arterial advertising structures and signs.  It must also be recalled that the City is enforcing a regulation which has been routinely ignored by the industry.  The industry has been on notice of the new law since 2001.  After eight years notice it cannot claim surprise.

The exceptions and inconsistencies in this case simply do not undermine the Zoning Resolution to the point of unconstitutionality.  As an initial matter, the Court considers signs on the street furniture, phone kiosks, lampposts, and other similar structures wholly distinct in comparison to the Clear Channel Plaintiffs' billboards.  Metromedia allows the government to value one type of commercial speech over another. See Metromedia, 453 U.S. at 512.  Likewise, the Ninth Circuit in Metro Lights recognized that Los Angeles had a valid interest in permitting "controlled offsite advertising on public transit facilities" while banning "uncontrolled offsite

advertising spread willy-nilly about the streets," and thus allowed the city to distinguish between two types of advertising that, on their face, seemed similar in kind. See Metro Lights, 551 F.3d at 910-11.

Here, the advertisements on street furniture, lampposts, taxicabs, and phone kiosks are a different type of commercial speech and are located in a different manner than the giant billboards controlled by the Plaintiffs, which are located to capture roadway eyes. Not only are the street furniture advertisements significantly smaller than the billboards, but they target a different class of consumer—one who is walking on City streets rather than driving on an arterial highway. Further, this category of commercial speech, particularly in respect to the Street Furniture Franchise, is an advertising medium subject to the aesthetic control of the City because of the contract with Cemusa. It is entirely appropriate for the City to value a category of commercial speech that has a consistent appearance and relatively small size. It may be said to create harmony in an otherwise chaotic streetscape. That goal is entirely praiseworthy and does not undermine the City's ability to restrict the uncontrolled proliferation of large billboards. See id.[26] Accordingly, the Court does not consider the Street Furniture Franchise and other related signs when looking at the full range of exceptions to the arterial advertising ban.

Assuming full enforcement of the City's laws, the arterial advertising signs that will remain are signs still grandfathered from 1980;[27] the signs within one-half mile of the City's border on certain specified highways; and signs that the City has no jurisdiction to regulate, such as signs on Transit Authority property, signs on the property of the Port Authority at the World

---

[26] Kerry Gould-Schmit, the former Assistant Commissioner for the Coordinated Street Furniture Franchise, asserts in a declaration that one of the goals of the City's Street Furniture Franchise is to eliminate the lack of coordination and poor maintenance of street furniture in the City. (See Declaration of Kerry Gould-Schmit ("Gould-Schmit Decl.") ¶¶ 6-8; see also Def. Ex. KK at 6, 24, 26.)

[27] As stated previously, the parties do not submit information about how many signs grandfathered in 1980 still qualify for legal non-conforming use status. As a possible example, the Court notes that Clear Channel, one of the largest outdoor advertising companies in New York, estimates that "at least" 19 of its sign faces will qualify for legal non-conforming use status. (See SOF ¶ 134.)

Trade Center, and perhaps signs on U.S. Government property.  The combined exceptions to the arterial advertising restriction number far less than the 634 arterial advertising signs that Plaintiffs estimate currently exist on private property. (See Kovner Decl. ¶ 7.)  The City's scheme is not perfect, and it is not without some exceptions, but those exceptions are relatively few and still declining, amounting to only a small percentage.

The adequacy of the City's regulatory scheme becomes particularly clear when comparing the exceptions here to the ones found unconstitutional in Greater New Orleans and Rubin.  In Greater New Orleans the speech regulation was contradictory because it banned all broadcast advertising about privately operated casinos but allowed such advertising about tribal-operated casinos and government-operated casinos. 527 U.S. at 190.  In Rubin the Court pointed out the "overall irrationality" of the government's regulatory scheme because, among other exceptions, it prohibited the display of alcohol content on labels while allowing it in advertising. 514 U.S. at 488.  In both cases the exceptions in the regulations worked at diametrically opposing purposes to the regulations' stated goals.  Here, the City is not favoring one type of content over another.  Off-site advertising signs are generally permissible, except when located in close proximity to the City's arterial highways and parkways.  The exceptions to this location rule are relatively few: signs that are either grandfathered, or outside of the City's regulatory jurisdiction, or signs of a wholly different size and type.  Looking at the arterial advertising restrictions in the context of the entire scheme, as this Court must, see Greater New Orleans, 527 U.S. at 192, the scheme is not inconsistent and does not undermine the City's goals of traffic safety and aesthetics.  Even with the few exceptions outlined by the Plaintiffs, the regulation directly advances the City's asserted interest and thus satisfies the third prong of Central Hudson.

It is also worth noting that while the Clear Channel Plaintiffs are certainly engaged in protected speech, this challenge is not motivated by an abstract concern about First Amendment rights as much as it is by a very real concern that Plaintiffs' financial prospects will be adversely impacted. Even with a fully enforced arterial advertising ban, the Clear Channel Plaintiffs will be able to host billboards in large areas of the City. (See SOF ¶¶ 141, 154.) The arterial advertising ban does not diminish the Plaintiffs' ability to speak; it only limits the location of the speech to an area less desirable to the Plaintiffs because their rates will presumably have to be reduced.

Before moving onto the fourth prong of Central Hudson, the Court reviews the Clear Channel Plaintiffs' three alternative arguments that the arterial advertising restrictions fail to directly advance the City's interest. First, Clear Channel argues that the restrictions will not work because the company will transfer its sign faces to non-commercial copy. The Court has already discussed and dismissed this "heads-I-win-tails-you-lose" argument. See Discussion Section IV(a), supra p. 30 n.23.

Second, the Clear Channel Plaintiffs argue that the exceptions uniformly and unconstitutionally favor the Government. Certainly, government cannot exempt itself from the speech restrictions it imposes on private parties. See Nichols Media Group LLC v. Town of Babylon, 365 F. Supp. 2d 295, 316-17 (E.D.N.Y. 2005) (finding that the town signs "must be subject to the same requirements as signs sought to be erected by non-governmental entities"). Plaintiffs argue that the Cemusa Street Furniture Franchise gives the City a broad financial incentive to exclude private advertisers for competitive reasons. As previously discussed, the City may value one category of commercial speech over another where it has valid reasons for doing so. See Metromedia, 453 U.S. at 511-12. The Court has already explained why the signs

in the Street Furniture Franchise are of a different type than the billboards owned by the Clear Channel Plaintiffs.  The City is free to value a controlled and harmonious streetscape without compromising its ability to restrict uncontrolled and obtrusive advertising on the City's arterial road network.  This is not a situation where the City is exempting its signs while banning the Plaintiffs' signs of the same type.  The City has stated that it will enforce the Zoning Resolution against all billboards on City and government property, where it is empowered and authorized to do so.  That is sufficient to satisfy the Court that the regulations treat City-owned billboards in the same manner as privately owned billboards.

Third, the Clear Channel Plaintiffs argue that the City must show, through actual evidence, that its regulations will in fact materially advance its interests in traffic safety and aesthetics.  The Plaintiffs argue that the City has failed to present any study linking a ban on billboards to improvements in traffic safety or aesthetics, and, further, that the City's history of underenforcement of the Zoning Resolution, as well as the grandfathering of signs in 1980 and the issuance of building permits between 1979 and 1999 for large accessory signs along arterial highways, show that the City puts little value on its stated interests.  The Clear Channel Plaintiffs cite Edenfield v. Fane, 507 U.S. 761 (1993), for the proposition that the burden of justifying a restriction on commercial speech "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield, 507 U.S. at 770-71.  Courts dealing with billboard regulation, however, have routinely found that aesthetics and traffic safety are valid reasons to restrict billboard placement, even without further studies backing the efficacy of the regulation. See Metromedia, 453 U.S. at 510 ("It is not speculative to recognize that billboards by their very nature, wherever located and

however constructed, can be perceived as an 'esthetic harm.'"); see also Ackerley Commc'ns of the Northwest v. Krochalis, 108 F.3d 1095, 1099-1100 (9th Cir. 1997) ("As a matter of law Seattle's ordinance, enacted to further the city's interest in esthetics and safety, is a constitutional restriction on commercial speech without detailed proof that the billboard regulation will in fact advance the city's interests."); Nichols Media Group, 365 F. Supp. 2d at 309 ("This court and others have agreed that a ban on off-site commercial speech directly advances the governmental interests of safety and aesthetics."); Infinity Outdoor, 165 F. Supp. 2d at 417. It is a matter of common sense, precedent, and, in this case, legislative determination that the Zoning Resolution will improve both the City's aesthetics and its traffic safety. See Vill. of Massapequa Park, 277 F.3d at 627 ("Municipalities and other government bodies have considerable leeway . . . in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech.") (internal quotation and citations omitted); Lamar Adver. of Penn, LLC v. Town of Orchard Park, No. 01-CV-556A(M), 2008 WL 781865, at *24 (W.D.N.Y. Feb. 25, 2008) ("[I]t is not for [the court] to second-guess the legislative judgments by the Town.").

 As for Central Hudson's fourth element, whether the regulation is more extensive than necessary to serve the City's interest, courts typically examine whether the regulation is narrowly tailored and if the proponents of the regulation "carefully calculated" the costs and benefits associated with the burden on speech. See Greater New Orleans, 527 U.S. at 188 ("The Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—a fit that is not necessarily perfect, but reasonable.") (quotations and citations omitted).

The Clear Channel Plaintiffs argue that the City could pass less drastic regulations that would still satisfy its goal of preventing uncontrolled proliferation of billboards along the arterial roads.  The Plaintiffs suggest limiting the regulations to apply only to new construction, creating spacing restrictions between signs, or even enforcing the restrictions only against structures located in zones where large billboards clash with the appearance of the surrounding area.  Besides the fact that this approach would allow Plaintiffs to keep many of their ill-gotten gains, nothing mandates that the City must consider what the Plaintiffs claim is a better idea—or one that would have less impact on the billboard industry.  Central Hudson's fourth prong requires that the regulation be a reasonable fit with the City's goals, or "a means narrowly tailored to achieve the desired objective." Lorillard Tobacco, 533 U.S. at 556; see also Vill. of Massapequa Park, 277 F.3d at 627.  The City need not use the least restrictive means, nor must it select the very best alternative.  The regulation must be a fit with the City's goals, and "[w]ithin those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." Bd. of Trs. v. Fox, 492 U.S. 469, 480 (1989).

In Lorillard Tobacco Co. v. Reilly, the Supreme Court found that a regulation banning advertising for smokeless tobacco or cigars within 1,000 feet of a school failed under Central Hudson's fourth prong because the reach of the regulation was overly inclusive: approximately 90% of Boston, Worchester, and Springfield, Massachusetts would be off-limit to such advertising. 533 U.S. at 561-62.  There is no such concern with New York City's Zoning Resolution in this case.  The City seeks only to prohibit off-site advertising signs within 200 feet and within view of arterial highways.  In contrast to the Clear Channel Plaintiffs' arguments, the arterial advertising restriction fits the City's twin goals of traffic safety and aesthetics, while providing ample opportunities for the Plaintiffs to host their advertisements in other areas of the

City.  See Infinity Outdoor, 165 F. Supp. 2d at 417 (finding that the same regulations passed Central Hudson's fourth prong because the Zoning Resolution "prohibits off-site commercial signs only where they cause the most aesthetic and traffic safety problems: near highways and parks, in residential neighborhoods, and in certain commercial districts").  The Zoning Resolution is sufficiently narrow, leaves ample room for outdoor advertising, and is a reasonable "fit" with the City's goals to satisfy the fourth step of Central Hudson.

### b.  Rule 49 Provisions

Plaintiffs challenge Rule 49's registration requirements for outdoor advertising companies seeking to qualify their signs for non-conforming use status.  As outlined earlier, in 1980 the City grandfathered off-site advertising signs built and used prior to November 1, 1979.  These signs received legal non-conforming use status.  Portions of Rule 49 set the parameters for how outdoor advertising companies prove that a sign retains its non-conforming use status, thus making it eligible to carry off-site arterial advertising.

The Clear Channel Plaintiffs argue that the provisions of Rule 49 fail under prongs three and four of Central Hudson.  The City disagrees, and urges that the Clear Channel Plaintiffs' First Amendment argument is premature because it is not ripe for review.

### i.  Ripeness

Ripeness refers to whether a court has jurisdiction to hear a dispute.  Jurisdictional questions contain two overlapping ripeness issues, and "[b]oth are concerned with whether a case has been brought prematurely." Simmonds v. INS, 326 F.3d 351, 357 (2d Cir. 2003).  The first issue is constitutional ripeness, which refers to the basic requirement under the Case or Controversy Clause of Article III that the question at issue emanate from an actual dispute. Id.

Constitutional ripeness is not in question in this matter, as the parties have an actual dispute over the constitutionality of the Rule 49 procedures.

The second issue is prudential ripeness; a court does not have jurisdiction over a dispute if "the case will be <u>better</u> decided later and [] the parties will not have constitutional rights undermined by the delay." <u>Id.</u> (emphasis in original); <u>see also</u> <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967) ("[The ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."). The determination of prudential ripeness triggers a two-step inquiry, evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." <u>Abbott Labs.</u>, 387 U.S. at 149. This determination involves a "pragmatic balancing of those two variables and the underlying interests which they represent." <u>Ciba-Geigy Corp. v. EPA</u>, 801 F.2d 430, 434 (D.C. Cir. 1986).

The fitness analysis is "concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." <u>Simmonds</u>, 326 F.3d at 359 (quoting <u>Isaacs v. Bowen</u>, 865 F.2d 468, 478 (2d Cir. 1989)). A claim is not ripe where it is directed "at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation." <u>Bowen</u>, 865 F.2d at 477. The claim may also fail for ripeness when a plaintiff has not exhausted administrative remedies and judicial review would be benefitted by waiting for the agency's views on how best to interpret the agency's regulation. <u>See</u> <u>Am. Sav. Bank, FSV v. UBS Fin. Servs., Inc.</u>, 347 F.3d 436, 440 (2d Cir. 2003). Conversely, an issue may be ripe where it "would not benefit from any further factual development and when the court

would be in no better position to adjudicate the issues in the future than it is now." N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008) (quoting Simmonds, 326 F.3d at 359).

Taken together, the fitness analysis requires "consideration of a variety of pragmatic factors: whether the agency's actions or inactions challenged in the law suit are 'final;' whether the issues presented for review are primarily legal as opposed to factual in nature; and whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established." Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 26 (2d Cir. 1984) (citing Abbott Labs., 387 U.S. at 149-51).

The hardship analysis, the second step of the ripeness review, examines "whether and to what extent the parties will endure hardship if the decision is withheld." Simmonds, 326 F.3d at 359. The mere possibility of hardship is not enough to make a case ripe; instead, the courts must ask "whether the challenged action creates a direct and immediate dilemma for the parties." N.Y. Civil Liberties Union, 528 F.3d at 134 (citation omitted).

Courts use a "somewhat relaxed" hardship analysis where the controversy involves a facial First Amendment challenge. See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002); see also New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499-1500 (10th Cir. 1995) ("The primary reasons for relaxing the ripeness analysis in this context is the chilling effect that potentially unconstitutional burdens on free speech may occasion."); Sanger v. Reno, 966 F. Supp. 151, 161 (E.D.N.Y. 1997) ("In the context of a First Amendment facial challenge to the validity of a statute, reasonable predictability of enforcement or threats of enforcement even where enforcement is not impending are sometimes enough to ripen a claim . . . However, courts have uniformly insisted,

even in the First Amendment context, that there must still exist some credible fear of enforcement.") (citations omitted).

Applying the law to the Clear Channel Plaintiffs' challenge, it is clear that their claim is ripe. Rule 49 was promulgated in 2006. The provisions of the Rule governing sign registration are not speculative or unknown. If found constitutional, the Rule will almost immediately apply to the Clear Channel Plaintiffs. The City argues that any harm to the Plaintiffs is "hypothetical" because the DOB has not yet completed a review of the Plaintiffs' applications for non-conforming status, so it is unclear how the DOB will interpret Rule 49's provisions. The City also argues that the Clear Channel Plaintiffs do not face an immediate harm because their signs will remain standing until the DOB completes its review, and, if the DOB finds the sign noncompliant, the Plaintiffs may challenge the determination through an administrative appeals process.

The Court is not persuaded. First, the constitutionality of Rule 49 is a legal question. The Court can look at the provisions of Rule 49 and determine, on their face, whether they are constitutional; the Court needs no further factual development. Second, the Rule is final. There is no indication that it will undergo any further revision. Third, the Plaintiffs face an immediate hardship if Rule 49 is upheld. There is more than a "credible fear" that the City will enforce the provisions of Rule 49 against the Clear Channel Plaintiffs; the City has been trying to enforce similar provisions since 2001. The Plaintiffs' challenge is fit for review and the Plaintiffs face an immediate hardship if the law is upheld. Accordingly, the Clear Channel Plaintiffs' challenge is ripe.

### ii.  First Amendment Challenge

The Clear Channel Plaintiffs base their First Amendment challenge on Central Hudson's third and fourth prongs.  On the third prong, the Clear Channel Plaintiffs make some of the same arguments they made when challenging the arterial advertising restriction.  They state that Rule 49's documentation requirements do not materially advance the City's interests because the City cannot reasonably claim that 29-year-old signs cause traffic safety problems or that enhanced documentary requirements will reduce the problem.  The Clear Channel Plaintiffs state that they will simply replace the commercial copy with non-commercial copy, thus thwarting the City's goals.  On the fourth prong, the Clear Channel Plaintiffs argue that the regulations are not narrowly tailored because they place the burden of proof on the outdoor advertisers to establish that the signs are non-conforming, and force them to prove this with evidence almost impossible to provide given the passage of time.  Further, they argue that the City could establish less stringent documentation policies that still meet the City's goals.

Section 49-15(d)(15) states that to register a sign as non-conforming, an outdoor advertising company must present: evidence that the sign existed as of November 1, 1979; evidence of the size of the sign at that time; and evidence that the sign carried advertising copy at that time. See 1 RCNY § 49-15(d)(15)(b).  "Acceptable evidence" under the provision includes "permits, sign-offs of applications after completion, photographs and leases," while "[a]ffidavits, Department cashier's receipts and permit applications, without other supporting documentation, are not sufficient . . . ." Id.[28]

The City argues that the regulations as written serve several important ends.  First, by placing the burden of proof on the outdoor advertisers to prove non-conforming status, the DOB

---

[28]      The Court recognizes that providing this type of evidence may be a burden, but it is a common one in the zoning world where prior non-conforming uses must be proven by the person claiming the benefit of the non-conforming use.

aids enforcement efforts by establishing a reliable list of legal non-conforming use signs. Second, by requiring documentation as to a sign's size and location, the DOB can more easily discover if a sign has lost its non-conforming use status due to changes in its location or surface area.  The City states that its evidentiary requirements are necessary because documents like affidavits, cashier's receipts, and permit applications are less reliable as proof of non-conforming status, while documents like permits, sign-offs of applications after completion, photographs, and leases are "credible, contemporaneous records." (See Arnold Decl. ¶ 40.)  Rule 49 does not preclude use of the supposedly less-reliable evidence, it simply requires that advertisers support less-reliable evidence with more-reliable evidence.[29]

The parties disagree about the availability of the documents that the City considers reliable.  The City says that DOB issued permits in 1980 to legalize non-conforming signs. (Id. ¶¶ 48-50; Def. Ex. Z, Ex. CC.)  The Clear Channel Plaintiffs argue that outdoor advertising companies typically retained only cashier's receipts—which look like permits—issued by DOB, and that DOB now considers these receipts unreliable. (See Geraghty Affirmation ¶ 65 & Ex. H.) The Plaintiffs state that in many cases outdoor advertising companies found little reason to retain key documents, either because of lack of enforcement or lax record-keeping by small businesses. In other cases documents may have been lost due to a series of acquisitions in the industry. (Id. ¶¶ 61-63.)  As a whole, the Clear Channel Plaintiffs paint a picture of an unregulated, disorganized registration and record-keeping process that has left the outdoor advertising companies without access to the very documentation they need to qualify a sign for non-

---

[29]       The DOB considers affidavits, cashier's receipts, and permit applications as less-reliable evidence of a sign's non-conforming use status because "they do not establish that an application to place an arterial advertising sign was finally approved or that the arterial advertising sign actually existed.  Rather, they reflect that a permit application fee and/or permit application was submitted to DOB." (See Arnold Decl. ¶ 42.)

conforming use status.  Nonetheless, current enforcement cannot be avoided or evaded by criticizing past practices and less stringent enforcement.[30]

The issue for the First Amendment analysis is whether the provisions of Rule 49 directly advance the City's interest in traffic safety and aesthetics and whether the regulations are narrowly tailored to meet those goals.  See Central Hudson, 447 U.S. at 566.  The registration provisions of Rule 49 pass both tests.

The provisions directly advance the City's interests and are narrowly tailored to serve those interests because the provisions are necessary to ensure an accurate accounting of the non-conforming use signs.  The history of billboard regulation in New York shows that accurate record-keeping was a low priority in the industry, for reasons that are likely attributable to both parties.  Now that the City intends to properly regulate the industry,[31] it has created a system which provides a minimal opportunity for fraud—an entirely appropriate concern given the outdoor advertising industry's uncontroverted history of illegal billboard construction and conversion.

Additionally, the requirements are not unduly harsh.  The regulations do not limit the documents that outdoor advertisers may use to prove non-conforming status.  The regulations allow a variety of documents that the City considers credible, and outdoor advertisers can

---

[30]    The Clear Channel Plaintiffs further challenge the provisions of 1 RCNY § 49-15(d)(15)(c), which requires an affidavit signed by a registered architect or engineer, as well as an officer of the outdoor advertising company. The architect or engineer must state that he or she believes the sign to be non-conforming based on the evidence submitted, and the company officer must state that to the best of his or her knowledge there has not been any discontinuance of the non-conforming use for two or more years. Id.  The Clear Channel Plaintiffs state that outdoor advertising companies will have difficulty locating an engineer who could sign such an affidavit. (See Geraghty Affirmation ¶¶ 57-59.)  This may be a commentary on industry practices, but it is no reason to find the requirement unconstitutional.

[31]    Even if the City was delinquent for years in its regulation of the outdoor advertising industry, it is well settled law that "estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties." In re Schorr v. N.Y. City Dep't of Hous. Pres. and Dev., 886 N.E.2d 762, 764 (N.Y. 2008).  To hold otherwise would allow proscribed conduct to continue to flourish, notwithstanding the fact that such conduct was and is impermissible.

supplement these credible documents with evidence that the City deems less credible, such as cashier's receipts. See 1 RCNY § 49-15(d)(15)(b).

The Rule 49 registration requirements materially advance the City's interest in determining whether an arterial advertising sign deserves legal non-conforming use status, which, in turn, serves the goal of improving traffic safety and aesthetics by removing non-exempt signs from the highways.  The registration provisions are a reasonable fit with those goals, particularly taking into account the City's past difficulty in controlling the legal registration of billboards and the industry's long history of admitted transgressions.  The Clear Channel Plaintiffs essentially argue that Rule 49 fails under Central Hudson because it will not work to improve traffic safety or the appearance of the City, and because the requirements are unduly stringent.  For the reasons already discussed, the Court rejects these arguments.  The City's proposed regulation and documentation scheme is appropriate and not unconstitutional; any misapplication of the City's power can be easily challenged in an Article 78 proceeding.

### c.  Free Speech Challenge Under the New York State Constitution

The Clear Channel Plaintiffs also allege a violation of the free speech provisions of the New York State Constitution, Article 1 § 8.[32]  The New York Court of Appeals has stated that the state constitution's free speech clause "contains language that is more expansive than its Federal counterpart and we have at times interpreted it in a manner that is more protective of free expression than the First Amendment to the Federal Constitution." Children of Bedford, Inc. v. Petromelis, 573 N.E.2d 541, 551 (N.Y. 1991), rev'd on other grounds, 592 N.E.2d 796 (N.Y. 1992); see also A.B.C. Home Furnishings, Inc. v. Town of E. Hampton, 947 F. Supp. 635, 643 (E.D.N.Y. 1996) ("New York courts have noted that the protection afforded by the guarantees of

---

[32]     The relevant portion of Article 1 § 8 of the New York State Constitution states, "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." See N.Y. Const. art. 1, § 8.

free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment.") (citation and internal quotation omitted).

There is no indication either in the case law or in the parties' arguments that New York State courts impose a stricter test for commercial speech regulation than that discussed in <u>Central Hudson</u>.  This Court has found no case where a New York State court determined the standard for reviewing a commercial free speech challenge under only the New York State Constitution and not the Federal Constitution as well.  Where the commercial free speech challenge included a federal right, the New York courts analyzed the entire claim under <u>Central Hudson</u>. <u>See, e.g.</u>, <u>Galaxy Rental Serv., Inc. v. State</u>, 452 N.Y.S.2d 921, 923-24 (App. Div. 4th Dep't 1982); <u>Citizens for a Safer Cmty. v. City of Rochester</u>, 627 N.Y.S.2d 193, 202 (Sup. Ct. Monroe Co. 1994).  Since this Court has already determined that the arterial advertising regulations do not violate the First and Fourteenth Amendments to the U.S. Constitution under the <u>Central Hudson</u> test, the Court also finds that the City's regulations do not violate New York State's constitutional free speech protections.

## V.  Application to Metro Fuel

Metro Fuel is in a different position than the Clear Channel Plaintiffs.  It challenges the provisions of the Zoning Resolution that control the placement and illumination of off-site advertising signs in commercial and manufacturing districts.  The zoning regulations permit Metro Fuel's non-accessory panel advertisements in C6-5, C6-7, and C7 districts with no restriction on illumination, and in C8, M1, M2, and M3 districts with illumination restrictions that make Metro Fuel's signs in those areas illegal in their current form. <u>See</u> Z.R. §§ 32-63, 42-52, 32-645, 42-533.  The City incorporated location and illumination restrictions in the 1961 Zoning Resolution. (<u>See</u> Neufeld Metro Fuel Decl. ¶ 7 & Ex. G, F, and H.)  The City argues that

these limitations are appropriate to preserve neighborhood character and maintain an attractive cityscape.[33]

Metro Fuel's legal arguments are essentially the same as the Clear Channel Plaintiffs'. Metro Fuel argues that the zoning restrictions are so pierced by exemptions as to undermine the City's goals. The company also argues that the City has not conducted any studies and cannot point to any evidence that the zoning restrictions will work, thus the regulations fail to directly advance the City's interests. Finally, Metro Fuel argues that the Court should be particularly sensitive to speech restrictions that block speech by private groups but allow the same speech by government.

Central Hudson's four-part test governs the analysis here. 477 U.S. at 566. The first two prongs are not seriously in question: the advertising that Metro Fuel hosts is neither misleading nor related to illegal activity, thus it is protected by the First Amendment; and the City's interest in aesthetics and the preservation of neighborhood character is substantial.[34] On the third and fourth prongs of Central Hudson, whether the speech restriction directly advances the City's interests and whether the restriction reaches no further than necessary,[35] Metro Fuel argues that

---

[33]   Metro Fuel argues that the City's aesthetic interests are invalid because the City awarded the Street Furniture Franchise to Cemusa even though the Evaluation Committee gave Cemusa the lowest design score among the contract bidders. This argument does not sway the Court. The City's aesthetic interests are not devalued simply because it did not choose the bidder with the highest design scores.

[34]   On this second prong, Metro Fuel and the City disagree about whether aesthetic interests alone can justify speech restrictions. Plaintiff cites a footnote discussing this issue in the District Court opinion in Metro Lights, 488 F. Supp. 2d at 947 n.10. The court there elaborated on the lack of guidance on this question, noting that in almost all cases courts have discussed traffic safety and aesthetic concerns in tandem. Id. As the parties have not made this issue a serious point of contention, the Court assumes that aesthetic concerns are a substantial interest. See Metromedia, 453 U.S. at 570 ("In my view, the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community.") (Rehnquist, J., dissenting); see also Berman v. Parker, 348 U.S. 26, 32 (1954) (noting that police power may be used to further aesthetic interests in the context of eminent domain, but not discussing speech restrictions); Suffolk Outdoor Adver. Co. v. Hulse, 373 N.E.2d 263, 265 (N.Y. 1977) ("Although once open to question, it is now equally clear that the regulation of outdoor advertising for aesthetic purposes alone constitutes a valid exercise of the police power.")

[35]   As discussed earlier, many courts combine the analysis of these last two prongs of Central Hudson. The ultimate analysis of the final two prongs "basically involve[s] a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." Edge Broad., 509 U.S. at 427-28 (citation omitted).

the City fundamentally undermines its aesthetic goals by allowing advertising similar to the Plaintiff's panel ads on street furniture, phone kiosks, and lampposts.  Citing Greater New Orleans, 527 U.S. at 173, and Rubin, 514 U.S. at 476, Metro Fuel states that the City's outdoor advertising restrictions fail because they are underinclusive.

Metro Fuel's main objection is with the City's street furniture contract with Cemusa. That contract requires Cemusa to replace 3,100 existing bus shelters and install up to an additional 400 shelters.  It also allows Cemusa to replace and install several hundred newsstands. Each bus shelter can contain two advertisements sized at 27.5 square feet each—slightly larger than Metro Fuel's panel signs.  The newsstands may display up to 82.5 square feet of advertising, with panels of varying sizes.  The bus shelter advertisements may be internally illuminated, much like the Metro Fuel panel signs.  The street furniture ads and Metro Fuel's panels may be located very near each other: Metro Fuel's panel signs are attached to buildings and poles off the far edge of the sidewalk; the bus shelters and newsstands are located on the street edge of the sidewalk, potentially only several feet away from Metro Fuel's advertisements.[36]

Greater New Orleans and Rubin hold that a speech regulation may fail where the content proscribed is directly contradicted by exceptions permitting the same type of speech that is impermissible.  See Greater New Orleans, 527 U.S. at 192-93 (noting that in Greater New

---

[36]     Metro Fuel also cites the thousands of advertisements on public pay telephones, on lamppost banners, and on street-level staircase railings at the entrance to MTA subway stations (MTA "urban panels") as evidence of the City's underinclusive speech restrictions.  The advertising on the public telephones typically ranges from approximately 11 square feet to 21 square feet, and the advertising is carried out under a number of different franchise agreements with the City. (SOF ¶¶ 95-99.)  The advertising on the lamppost banners is essentially the same square footage as Metro Fuel's panel advertisements, but the City limits the banners to cultural or community content, with up to 10% of each banner available for corporate sponsorship. (Id. ¶ 111.)  The MTA urban panels are approximately 11 square feet. (Id. ¶ 36.)  As discussed earlier in Background Section IV(a)(ii), the City does not have the authority to regulate these urban panels as they are on the property of the Transit Authority.  As for the pay telephones and lamppost banners, the Court's analysis of the Cemusa street furniture agreement applies equally to the City's regulation of those forms of commercial speech.

Orleans, as in Rubin, "there was 'little chance' that the speech restriction could have directly and materially advanced its aim, 'while other provisions of the same Act directly undermined and counteracted its effects'") (citing Rubin, 514 U.S. at 489).

The City argues that it has a valid reason to distinguish between advertising on buildings and poles covered by the Zoning Resolution and advertising on streets which are not covered by zoning. Controlled advertising on street furniture, lamppost banners, and telephone kiosks harmonizes the streetscape, and does not undermine the City's aesthetic interest in restricting similar advertising attached to buildings which are subject to zoning limitations. To support this distinction the City points to a declaration from Douglas Woodward, who describes himself as having more than 20 years of experience as a "planner and urban designer at the New York City Department of City Planning," among his other relevant credentials. (See Declaration of Douglas Woodward ("Woodward Decl.") ¶ 6.) Mr. Woodward states that the street is a dynamic and unitary network that links neighborhoods of a city. (Id. ¶ 19.) The street is naturally filled with information such as directional signs and safety notices, as well as with amenities such as bus stops, newsstands, and fire hydrants. (Id. ¶ 40.) Mr. Woodward argues that while the street "is a medium for public communication," the façades of buildings on private property are of a wholly different character. (Id. ¶¶ 43-44.) The public's expectation of signage on buildings is to identify the uses within the building, and off-site advertising on building fronts "blurs the distinction between public and private, and makes the City more chaotic, less readily understandable, and erodes the sense of place." (Id. ¶ 45.)

While Metro Fuel discounts Mr. Woodward's analysis, he is not wrong. Zoning covers property and buildings, but streets are in the public right of way. The City's vitality, activity, and diversity are manifested on its streets, and streets are the community's natural gathering

points. See, generally, Jane Jacobs, The Death and Life of Great American Cities (Random House 1961).  It is not fanciful to suggest that there is a real distinction between streets and buildings.  Certainly it is permissible for the City to regulate, via its franchise rules, a wide variety of street furniture, including bus stop shelters and newsstands, so that they are uniform and contribute to a harmonizing scheme for city streets.  The Street Furniture Franchise enables the City to tie together many of the disparate elements on the City's street grid.  That goal cannot be achieved by zoning because zoning is not applicable.  The City's actions with regard to streets in the public right of way cannot compromise or restrict its abilities to apply different rules via zoning for the simple reason that buildings are not streets and streets are not buildings.  Different rules may be applied.  The City's approach is entirely consistent with Metromedia and the recent Ninth Circuit decision in Metro Lights.

The Metromedia Court held that it was valid for San Diego to determine that "some commercial interests outweigh[ed] its municipal interests" in traffic safety and aesthetics, thus San Diego could ban off-site commercial advertising while determining that on-site commercial advertising had enough social value to overcome the City's protective desires. Metromedia, 453 U.S. at 512.  Simply because San Diego valued on-site accessory advertising, it did not follow that San Diego "must give similar weight to all other commercial advertising." Id.  The Ninth Circuit followed similar reasoning in reversing the District Court's decision in Metro Lights, which Metro Fuel had relied upon extensively in this case. See Metro Lights, 551 F.3d at 910-11. The Ninth Circuit refused to overturn Los Angeles' legislative decision to value one type of commercial speech—controlled off-site advertising on public transit facilities—over another type of commercial speech—uncontrolled off-site advertising spread around the streets. Id. ("As the district court noted, the City has been compensated handsomely for this classically legislative

decision . . . The <u>Metromedia</u> Court declined to overrule such a legislative judgment, and so do we.") (internal citation omitted).

Here, New York City has a basis for distinguishing between off-site commercial advertising within the Street Furniture Franchise and off-site commercial advertising on building façades and poles. The former is obviously on the streets, not buildings, and is subject to the design controls contained in the City's franchise agreement with Cemusa. The City can control the size, location, and appearance of the advertisements on the street furniture. (<u>See</u> Cemusa Franchise Agreement, located at Hecker Decl. Ex. 13 at 12-13, 19-20.) Indeed, one major goal of the Street Furniture Franchise was to provide a harmonized, coordinated, and well-maintained appearance to the City's street furniture, while also reducing clutter on City sidewalks. (<u>See</u> Neufeld Metro Fuel Decl. Ex. S at 6, 24, 26; <u>id.</u> Ex. T at 3; <u>id.</u> Ex. V at 3; <u>id.</u> Ex. P at NYC-OTR007002; Gould-Schmit Decl. ¶¶ 6-7, located at Neufeld Metro Fuel Decl. Ex. B.)[37] Allowing limited and controlled advertising on the street furniture meets this goal.

The Plaintiff's panel advertisements, to the contrary, represent the type of uncontrolled visual clutter that led the City to enact restrictive zoning regulations. Building façades throughout the City are already chock full of accessory signage. It is not unreasonable for the City to try to impose some limits on commercial advertising. Metro Fuel can advertise without restriction in a number of areas. Metro Fuel also can legitimize a large number of its signs by changing the illumination scheme. While the First Amendment is broad, it has yet to be held that it trumps a City's right to impose illumination requirements. Further, it must be noted that Metro Fuel is the architect of much about which it complains. Metro Fuel erected most of its panel advertisements without permits to do so. (Metro SOF ¶ 4.) Metro Fuel also erected 80 additional

---

[37]    The CPC originally approved a coordinated street furniture franchise plan in 1996, but later decided not to award a contract under the plan. The City revised the franchise plan in 2003 and used many of the same criteria from the earlier plan. (<u>See</u> Gould-Schmit Decl. ¶¶ 13-36.)

panel signs between September 2007, when the City agreed to stay enforcement of Metro Fuel's

360 panel signs, and August 2008, when Metro Fuel reported to this Court that it operated

approximately 440 panel signs. (Compare Neufeld Metro Fuel Decl. Ex. NN with Freedman

Decl. ¶ 2.)

Consistent with Metromedia and the Ninth Circuit's decision in Metro Lights, the Court

accepts New York City's legislative and executive franchise determination that controlled,

coordinated off-site advertising on street furniture carries a greater value than uncontrolled off-

site advertising on buildings. See Metromedia, 453 U.S. at 512 ("San Diego has obviously

chosen to value one kind of commercial speech—onsite advertising—more than another kind of

commercial speech—offsite advertising . . . We do not reject that judgment."); Metro Lights, 551

F.3d at 911 ("[H]ere there is 'some basis for distinguishing' offsite commercial signage

concentrated and controlled at transit stops and uncontrolled, private, offsite commercial signage

'that is relevant to an interest asserted by the city.'") (quoting Cincinnati v. Discovery Network,

Inc., 507 U.S. 410, 428 (1993)); see also Jim Gall Auctioneers, Inc. v. City of Coral Gables, 210

F.3d 1331, 1333 (11th Cir. 2000) (upholding regulation that prohibited advertising auctions of

non-homeowner goods in a residential district while also allowing advertising for other types of

commercial sales); Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 (11th Cir.

1987) ("[A] partial solution to a city's aesthetic problems may still directly advance the city's

goals.  The Constitution does not require the City to choose between curing all of its aesthetic

problems or curing none at all.").  Streets and buildings are different; accordingly, different

standards may be imposed.  Metro Fuel does not like the distinction, but it is not, as the Court in

Greater New Orleans described it, "distinguish[ing] among the indistinct." 527 U.S. at 195.

It is clear that the zoning regulations controlling the placement and illumination of the Plaintiff's panel advertisements pass the third prong of <u>Central Hudson</u> because they will directly advance the City's interest in improving the attractiveness of the buildings facing the streets. Metro Fuel argues that the regulations fail this prong because the City has conducted no studies to show that the regulations will work, as the Supreme Court required in <u>Edenfield</u>. <u>See</u> 507 U.S. at 770-71 (the burden of justifying a restriction on commercial speech "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree").

Numerous courts have held, however, that a municipality's judgment that outdoor advertising signs cause an aesthetic harm is not mere speculation, as any observer can determine simply by walking on a busy City street. No study is required to prove what the eye can readily detect. The Supreme Court discussed this issue when analyzing <u>Central Hudson</u>'s third prong in <u>Metromedia</u> and held that, "It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.' . . . Such esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." 453 U.S. at 510 (citations omitted); <u>see</u> <u>also</u> <u>Taxpayers for Vincent</u>, 466 U.S. at 807 ("We reaffirm the conclusion of the majority in <u>Metromedia</u>. The problem addressed by this ordinance—the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit."); <u>Infinity Outdoor</u>, 165 F. Supp. 2d at 417 (citing <u>Metromedia</u>, 453 U.S. at 509-10).

Metro Fuel suggests that the City's aesthetic concerns are only a masquerade for the City's real interest in making money—i.e., it argues that the City limits advertising on buildings in order to enhance its revenues from the Street Furniture Franchise. That may be, but the uncontroverted fact is that the City's aesthetic concerns regarding advertising signs date back almost seven decades. In 1940, when the City first began regulating outdoor signs through zoning amendments, the CPC discussed how the attractiveness of the City's streets had a vital economic impact and that off-site advertising signs and billboards had become a problem. The CPC stated that it:

> early reached the conclusion that far from being a purely aesthetic matter, as was claimed by many at the hearings, this problem is primarily economic and hence of fundamental concern both to private individuals and to the city itself. What power has a city to attract or even retain residents, if its home areas are rendered unattractive by reason of excessive outdoor advertising displays?

See Neufeld Metro Fuel Decl. Ex. E at 90 (emphasis added). Those concerns have nothing whatsoever to do with the City franchise for street furniture. The City determined long ago that advertising signs could have a detrimental economic impact on the City, and thus it passed zoning laws to deter the problem. It added to those laws in 1961 to restrict off-site advertising signs to certain districts. The City's determination that advertising signs cause an aesthetic harm is backed by adequate legislative history and is more than just "a public rationalization of an impermissible purpose." Metromedia, 453 U.S. at 510. Its long-standing concerns both pre-date and are separate and apart from its agreement with Cemusa.

The regulations satisfy Central Hudson's fourth prong because they are no more extensive than necessary. The regulations must be "a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable." Fla. Bar v. Went for It, Inc., 515 U.S. 618, 632 (1995) (internal quotations and citations omitted).

Additionally, "the existence of 'numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable.'" Id. (citing Discovery Network, 507 U.S. at 417 n.13).  The relevant zoning regulations do not ban advertising.  If Metro Fuel changed its illumination scheme it could lease more signs.  The restrictions here are not on signs but on illumination.  Indeed, off-site outdoor advertising signs are allowed in specific commercial and manufacturing areas of the City where the negative aesthetic impact will be minimal.  The Zoning Resolution is not overbroad.  It limits outdoor advertising signs only in districts where the City believes they cause an aesthetic harm.  Metro Fuel's panel advertisements are still allowed in significantly large areas of the City, just not in all the places where Metro Fuel wishes.  It hardly needs to be said that Metro Fuel's wishes are not constitutional commands.

The Supreme Court, applying Central Hudson prong four in Metromedia, held that "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.  The city has gone no further than necessary in seeking to meet its ends." 453 U.S. at 508.  Here, similarly, the City has not gone further than necessary in restricting Metro Fuel's panel advertisements to certain areas of the City and to certain illumination requirements.[38]

Lastly, Metro Fuel argues that courts must be particularly wary of speech regulations that benefit the government while excluding others.  Similar to the Clear Channel Plaintiffs, Metro Fuel cites Nichols Media Group, where the court struck down a portion of a billboard ordinance that contained an express exception for government signs. 365 F. Supp. 2d at 316 ("By freeing

---

[38]     For the same reasons as outlined in Discussion Section IV(c), supra pp. 49-50, Metro Fuel's claim under the New York State Constitution is denied.

governmental signs from the reach of the Ordinances, the Towns have created an impermissible distinction that favors the Towns' speech over that of other speakers."). In Nichols Media Group the ordinance restricted off-site advertising signs, portable signs, and obscene signs, while fully exempting governmental signs from regulation. Id. at 300-01. Nichols is not really applicable here for the simple reason that the Zoning Resolution does not exempt the City from its requirements. As previously observed, the Zoning Resolution, which controls privately owned buildings and lots, is not applicable to City property in the public right of way.

The Ninth Circuit in Metro Lights recognized the distinction being made here. The Plaintiffs in Metro Lights argued that Los Angeles had impermissibly allowed itself to host advertising while excluding privately controlled advertising. The Ninth Circuit rejected the argument:

> Metro Lights has implied several times that the City's overall scheme makes the City a monopolist in the supply of commercial advertising space . . . But the First Amendment does not prohibit municipal monopolies. As long as the City can show with plausibility sufficient to merit the deference of Metromedia that the Sign Ordinance, even coupled with the [street furniture agreement], advances the City's interests and is narrowly tailored, then the City's policy survives First Amendment scrutiny.

Metro Lights, 551 F.3d at 914 n.13. As previously discussed, the City's Zoning Resolution advances the City's interest and is no more extensive than necessary. Additionally, the City's franchise of street furniture and pay telephones advances its interests and is applicable only in the public right of way. For the reasons previously stated, the City's franchise on the City's streets does not compromise its ability to regulate advertising via its Zoning Resolution, which by its own terms does not govern the streets.

## CONCLUSION FOR ALL PARTIES

Upon review of the voluminous record, the Court has determined that there are no issues of material fact in either of the cases. Any factual disputes are trivial, non-essential, and do not materially affect the outcome of the cases. Accordingly, summary judgment is appropriate.

The City's zoning regulations, which restrict the location of commercial advertising signs immediately adjacent to its arterial highway system, satisfy the constitutional test for commercial speech restriction and are not unconstitutionally underinclusive. New York City has substantial interests in restricting outdoor advertising signs near highways, its zoning ordinance will directly advance those interests, and the regulations are not more extensive than necessary. The few exceptions to the ban on off-site commercial arterial advertising that remain along the City's roads do not undermine the constitutionality of the Zoning Resolution. For the same reasons, the Zoning Resolution's registration and documentation requirements also pass constitutional muster. Since the City's rules are constitutional, the Clear Channel Plaintiffs cannot show irreparable harm and a likelihood of success on the merits. Accordingly, for the reasons already outlined in this Opinion and Order, the Defendants' motion for summary judgment is GRANTED and the Clear Channel Plaintiffs' motions for summary judgment and for a preliminary injunction are DENIED.

Likewise, there is no constitutional infirmity with the Zoning Resolution's location and illumination restrictions that affect Metro Fuel. The City has a substantial interest in protecting neighborhood aesthetics, the regulations directly advance that interest, and they are not more extensive than necessary. The City's franchise for street furniture, which permits advertising, does not undermine the Zoning Resolution's constitutionality. Accordingly, for the reasons already discussed, the City's motion for summary judgment is GRANTED and Metro Fuel's

motion for summary judgment or for a preliminary injunction is DENIED.  The Clerk of the
Court is ordered to close out this case.


Dated:  New York, New York
       March 31, 2009

                                                SO ORDERED

                                                PAUL A. CROTTY
                                                United States District Judge